UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

MICHAEL SELSOR,                          )
                                         )
                Petitioner,              )
                                         )
v.                                       )          Case No. 01-CV-0721-CVE- TLW
                                         )
RANDALL G. WORKMAN,[1] Warden,           )
Oklahoma State Penitentiary,             )
                                         )
                Respondent.              )

## OPINION AND ORDER

Before the Court is Oklahoma death row inmate Michael Selsor's petition for a writ of

habeas corpus and brief in support filed pursuant to 28 U.S.C. § 2254 (Dkt. ## 17, 18). Selsor, who

appears through counsel, challenges his conviction and sentence in Tulsa County District Court Case

No. CRF-75-2181.[2] Respondent filed a response to the petition denying its allegations (Dkt. # 28),

and Selsor filed a reply (Dkt. # 32). Both parties filed supplemental briefs (Dkt. ## 40, 44). For the

reasons discussed below, the Court concludes the petition should be denied.

## BACKGROUND

**I.      Factual Background**

Pursuant to 28 U.S.C. § 2254(e)(1), the historical facts found by the state court are presumed

correct. In considering the issues presented in the petition, the Court relied upon the following

synopsis from the Oklahoma Court of Criminal Appeals ("OCCA") in that court's direct appeal

---

[1]      Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the **Court Clerk** shall be
         directed to substitute Randall G. Workman for Mike Mullin as the party Respondent.

[2]      Case No. CRF-75-2181 is identified in some documents as CF-75-2181.

opinion. Following review of the record, trial transcripts, trial exhibits, and other materials submitted

by the parties, the Court finds this summary by the OCCA is adequate and accurate. Therefore, the

Court adopts the following summary as its own.[3]

> At approximately 11:00 p.m. on September 15, 1975, Selsor and Richard Eugene
> Dodson robbed the U-TOTE-M convenience store at 5950 33rd West Avenue in
> Tulsa. Selsor and Dodson entered the store, each armed with a .22 caliber handgun.
> Employee Clayton Chandler was working at the cash register. Selsor approached
> Chandler, pulled his gun, and demanded the contents of the register. Dodson located
> employee Ina Morris, who was restocking the walk-in cooler. Dodson pointed his
> gun at her and ordered her to get down. Morris replied, "You've got to be kidding
> me." Dodson then fired a shot striking Morris in the shoulder.
>
> Chandler loaded a sack with money and handed it to Selsor, who then shot Chandler
> several times in the chest killing him. Upon hearing the shots, Dodson emptied his
> weapon through the cooler door at Morris. Morris was shot in the head, neck and
> shoulder, but survived. Selsor and Dodson then fled.
>
> On September 22, 1975, Selsor and Dodson were arrested in Santa Barbara,
> California. Selsor confessed this and other crimes to Detective John Evans of the
> Santa Barbara Police Department. In his confession, Selsor admitted that before
> entering the store, he and Dodson had agreed to leave no witnesses.

Selsor v. Oklahoma, 2 P.3d 344, 347-48 (Okla. Crim. App. 2000) (hereinafter "Selsor II").

## II.   Procedural History

A review of the unique procedural history of Selsor's trials and appeals following the 1975

crimes is essential to the analysis of his habeas corpus claims. Selsor and co-defendant Richard

Dodson[4] were initially charged on September 19, 1975, with First Degree Murder (Tulsa County

---

[3]      Additional facts, apparent from the record, may be presented throughout this opinion as they
become pertinent to the Court's analysis.

[4]      Dodson was convicted of shooting with intent to kill and robbery with firearms, but was
acquitted of first degree murder. He was sentenced to 199 years for shooting with intent to
kill and 50 years for the armed robbery conviction. His convictions and sentences were
affirmed. Dodson v. State, 562 P.2d 916 (Okla. Crim. App. 1977).

District Court Case No. CRF-75-2181), Shooting with Intent to Kill (Tulsa County District Court Case No. CRF-75-2182), and Robbery with Firearms (Tulsa County District Court Case No. CRF-75-2183). The cases were consolidated for trial under Case No. CRF-75-2181. Following a jury trial, Selsor was found guilty of all three crimes. In accordance with the jury's recommendations, Selsor was sentenced to death for the First Degree Murder conviction, twenty (20) years imprisonment for Shooting with Intent to Kill, and twenty-five (25) years imprisonment for Robbery with Firearms.

On appeal to the Oklahoma Court of Criminal Appeals ("OCCA"), Selsor's convictions were affirmed but his death sentence was modified to life imprisonment. Selsor v. State, 562 P.2d 926 (Okla. Crim. App. 1977) (hereinafter "Selsor I" ). The modification of his death sentence was based upon then recent United States Supreme Court decisions which questioned the constitutionality of Oklahoma's murder statutes, and the resulting repeal on July 24, 1976, of those statutes by the Oklahoma legislature. See Riggs v. Branch, 554 P.2d 823, 824-25 (Okla. Crim. App. 1976), *overruled by* Selsor v. Turnbull, 947 P.2d 579 (Okla. Crim. App. 1997) (hereinafter "Selsor MA"), and cases cited therein.

In 1978 and 1989, Selsor filed two separate applications for post-conviction relief in state court. The district court denied each application, and the OCCA affirmed the denials. See "Application to Assume Original Jurisdiction and Petition for Writ of Prohibition and/or Mandamus" at ¶ 4, in OCCA Case No. P-97-911.

On October 21, 1991, Selsor filed a petition for federal habeas corpus relief with this federal district court in Case No. 91-CV-826-JOE. By Order dated December 1, 1992, the Court denied habeas corpus relief. Selsor appealed to the Tenth Circuit Court of Appeals, which affirmed in part but remanded the case back to this Court for a hearing on Selsor's ineffective assistance

3

of counsel claim. See Selsor v. Kaiser, 22 F.3d 1029 (10th Cir. 1994). A hearing was conducted. On November 10, 1994, this Court again denied Selsor's petition for habeas corpus relief.  Selsor again appealed to the Tenth Circuit Court of Appeals. The Court of Appeals reversed this Court's decision and remanded with instructions to enter judgment invalidating Selsor's convictions on ineffective assistance of counsel grounds, but providing that the judgment was without prejudice to further proceedings by the state for retrial within a reasonable time. See Selsor v. Kaiser, 81 F.3d 1492, 1506 (10th Cir. 1996). On May 9, 1996, this Court complied with the mandate from the Tenth Circuit and advised the parties that the writ of habeas corpus would issue unless the State of Oklahoma initiated proceedings to retry Selsor within 120 days. The State complied by initiating new trial proceedings.

However, during the pendency of Selsor's various appeals and habeas corpus proceedings, the Oklahoma legislature enacted new first degree murder and death penalty statutes. Prior to Selsor's retrial in state court, the State filed a Bill of Particulars alleging four aggravating circumstances to support a possible death sentence. Selsor challenged the State's request for the death penalty, both in state district court and before the OCCA by filing an application for writ of prohibition and/or mandamus. The OCCA concluded that, because Selsor's previous conviction and sentence had been vacated, he was in a situation similar to persons awaiting trial under the current murder and death penalty statutes. Selsor MA, 947 P.2d at 582-83 (citing Dobbert v. Florida, 432 U.S. 282, 301 (1977)). The OCCA denied relief, and the State was allowed to seek the death penalty in Selsor's second trial.

Once again, Selsor was convicted by a jury of First Degree Murder, Shooting with Intent to Kill, and Robbery with Firearms. The jury in Selsor's retrial found the existence of two

aggravating circumstances[5] and recommended the death penalty for the First Degree Murder conviction. The trial judge, in accordance with the jury's recommendations, sentenced Selsor to death for the First Degree Murder conviction, life imprisonment for the Shooting with Intent to Kill conviction, and twenty (20) years for Robbery with Firearms.

Selsor filed a direct appeal of his convictions and sentences to the OCCA in Case No. F-98-531, identifying thirteen (13) propositions of error as follows:

Proposition 1:    The retroactive application of the current first degree murder statute and its corresponding penalty provisions as contained in Okla. Stat. tit. 21, §§ 701.7-701.15 (1991), violated the prohibition against *ex post facto* laws under Article I, § 10 of the United States Constitution and Article II, § 15 of the Oklahoma Constitution.

Proposition 2:    The retroactive application of the current death penalty statute to Mr. Selsor's 1975 homicide violated the constitutional prohibition against *ex post facto* laws, the multiple punishments prohibition of the double jeopardy clause and principles of equal protection and due process. Mr. Selsor's sentence of death should be modified to the only legally available punishment -- life imprisonment with the possibility of parole.

Proposition 3:    The retroactive application of this court's decision overruling *Riggs v. Branch* violated Mr. Selsor's rights to due process under the Fourteenth Amendment to the United States Constitution and Article II, §§ 7 and 20 of the Oklahoma Constitution.

Proposition 4:    Even if Appellant's death sentence does not technically violate the *ex post facto* clause, double jeopardy principles or the equal protection clause, it violated the fundamental fairness doctrine and

---

[5]    The jury found that (1) Selsor knowingly created a great risk of death to more than one person, and (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. See O.R. Vol. III at 350. The jury did not find the existence of two other aggravating circumstances propounded by the prosecution, namely that (1) the murder was especially heinous, atrocious or cruel, and (2) there exists a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Id.

should be modified to life imprisonment with the possibility of parole.

Proposition 5: The Information in this case was ambiguous and wholly failed to inform Mr. Selsor of the theory of homicide upon which the State would rely to obtain a conviction. Further, the jury instructions were fatally defective as they did not identify all the elements of the offense with which Mr. Selsor was charged. These defects resulted in fundamental and reversible error in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 16, and 20 of the Oklahoma Constitution.

Proposition 6: The retroactive application of the current shooting with intent to kill statute and its corresponding penalty provisions as contained in Okla. Stat. tit. 21, § 652 (1991), violated the prohibition against *ex post facto* laws under Article I, § 10 of the United States Constitution and Article II, § 15 of the Oklahoma Constitution.

Proposition 7: The trial court erred by refusing to conduct individual sequestered voir dire.

Proposition 8: Mr. Selsor was deprived of a fair trial and a fair sentencing hearing by the improper tactics, remarks, and arguments of the prosecutors during both stages of trial.

Proposition 9: Mr. Selsor's death sentence must be vacated because the victim impact evidence introduced in the penalty phase violated the rules of evidence and his rights protected by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition 10: The evidence was insufficient to prove beyond a reasonable doubt the aggravating circumstance that Mr. Selsor knowingly created a great risk of death to more than one person.

Proposition 11: The use of inadmissible and prejudicial evidence in support of the continuing threat aggravating circumstance improperly contributed to the verdict of death.

Proposition 12: Mr. Selsor was deprived of effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9, and 20 of the Oklahoma Constitution.

6

Proposition 13:    The accumulation of error in this case deprived Mr. Selsor of due process of law and a reliable sentencing proceeding in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, and 9 of the Oklahoma Constitution.

See Dkt. # 36, Brief of Appellant in OCCA Case No. F-98-531.

On April 10, 2000, the OCCA affirmed the conviction and sentence for first degree murder, affirmed the conviction for shooting with intent to kill but modified the sentence to twenty (20) years, and reversed and remanded the conviction and sentence for robbery with firearms, with instructions to dismiss. Selsor II, 2 P.3d at 346 . The OCCA denied a rehearing on May 10, 2000. Id. at 344.

Next, Selsor sought post-conviction relief from the OCCA in case No. PC-2000-87, raising the following errors:

Proposition I:    Mr. Selsor was denied the effective assistance of counsel in his federal habeas corpus action.

Proposition II:    Mr. Selsor was denied his fundamental right to present a defense when the trial court sustained the objection to Bervin Knott's answer to the question concerning Richard Dodson, and appellate counsel was ineffective for failing to raise this issue on direct appeal, depriving Mr. Selsor of his Sixth and Fourteenth Amendment rights.

Proposition III:    Mr. Selsor was denied the effective assistance of appellate counsel when she failed to raise the issue that the conviction must be reduced to murder in the second degree.

Proposition IV:    To execute Mr. Selsor now, after he has spent twenty-four years in prison, would violate the Eighth Amendment's ban on cruel and unusual punishment and the ban on cruel or unusual punishment found in Art. II, Section 9 of the Oklahoma Constitution; direct appeal counsel was ineffective for failing to raise this issue.

7

See Dkt. # 36, Application for Post-Conviction Relief in OCCA Case No. PC-2000-87. All requested relief was denied on April 27, 2000, in an unpublished opinion. (Dkt. # 36, Order Denying Application for Post-Conviction Relief).

Next, Selsor filed a petition for writ of certiorari in the United States Supreme Court. On May 21, 2001, that request was denied. Selsor v. Oklahoma, 532 U.S. 1039 (2001).

Selsor initiated the instant habeas corpus proceeding on October 3, 2001 (Dkt. # 1). In his petition (Dkt. # 17), filed on May 20, 2002, he identifies the following eighteen (18) grounds for relief:

Ground 1:     The Petitioner was subjected to *ex post facto* laws, in violation of art. I, § 10 of the United States Constitution, by his trial, conviction and death sentence pursuant to Okla. Stat., tit. 21, §§7-701.7-701.15 in case CF-75-2181, inasmuch as these statutes were enacted after September 15, 1975, the date of the alleged offense.

Ground 2:     The Petitioner was denied due process of law and his right to counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, by the death sentence sought and imposed in case CF-75-2181, following the Petitioner's successful federal constitutional challenge to the validity of his conviction in case 91-C-826-E (N.D. Okla.), because of the unforeseeable, unfair, arbitrary and vindictive application of Okla. Stat., tit. 21, §§7-701.7-701.15, and the failure to apply Okla. Stat., tit. 21, §§ 701.1-701.6 and Riggs v. Branch, 554 P.2d 823 (Okla. Crim. App. 1976), by the Oklahoma prosecutors and courts. Such unforeseeability existed at the time of the offense, at the 1991 initiation of the Petitioner's *pro se* federal habeas corpus action, and during its pendency through 1996. The Petitioner justifiably relied on the decisions in Riggs v. Branch, 554 P.2d 823 (Okla. Crim. App. 1976), and Selsor v. State, 562 P.2d 926 (Okla. Crim. App. 1977), and the position taken by Oklahoma's Attorney General in the latter case, all of which assured him that the maximum possible punishment in any retrial of CRF-75-2181 was life imprisonment, when he initiated and prosecuted his federal habeas corpus action.

Ground 3:     The Petitioner was denied equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution, by the State's intentional imposition of a death sentence on him in case CF-75-2181, because that sentence was more severe than the life sentences sought for

8

other similarly situated persons awaiting trial for violation of Okla. Stat., tit. 21, § 701.1, and more severe than the life sentences imposed on all other similarly situated persons convicted for violation of Okla. Stat., tit. 21, § 701.1, and is unjustified by any compelling state interest.

Ground 4:     The Petitioner was placed in double jeopardy, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, by his trial, by additional factfinding conducted on appeal after trial, and by his death sentence for first degree murder in case CF-75-2181, because of the Petitioner's trial, conviction and punishment for robbery with a firearm in case CF-75-2183 (Tulsa Cnty., Okla. Dist. Ct.), and because of the 1977 proceedings which resulted in imposition of a life sentence on the Petitioner for the homicide charged in case CF-75-2181.

Ground 5:     The Petitioner was denied his rights to due process of law, notice of charges and jury trial, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, by his trial and conviction and sentence for a violation of Okla. Stat., tit. 21, §701.7 in case CF-75-2181, when such violation had never been charged, and by the upholding of his conviction by the Court of Criminal Appeals of Oklahoma for a violation of Okla. Stat., tit. 21, §701.1, when such offense had never been submitted to or found beyond a reasonable doubt by a jury in the first instance.

Ground 6:     The Petitioner was denied his rights under the Fifth and Fourteenth Amendments to the United States Constitution by admission of evidence of and about the Petitioner's in-custody statement to police officers in Santa Barbara, California on September 22, 1975, which statement was the product of interrogation in violation of the requirements of Miranda v. Arizona, including an ineffective waiver of rights due to untrue information furnished by his interrogator in response to the Petitioner's question about use of his statements in court.

Ground 7:     The Petitioner was denied due process of law, a fair jury trial and a reliable capital sentencing determination, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, by the prosecution's presentation and use of victim impact evidence, including the wholly inadmissible victim impact evidence of Ina Morris and Neomah Wilson, the inadmissible emotional loss evidence and opinions about the appropriate sentence from both Debbie Huggins and Anne Chandler, all of which was exploited during the prosecutor's second stage closing argument.

Ground 8:     The Petitioner was denied due process of law, a fair jury trial and a reliable capital sentencing determination, in violation of the Sixth, Eighth and

9

Fourteenth Amendments to the United States Constitution, by the following improper actions of prosecutors: soliciting misleading testimony from witness Richard Dodson implying that shots allegedly fired by the Petitioner were the motivation for Dodson's own shots; arguing during second stage closing argument that Dodson's first shot was a warning shot, when there was no such evidence; appealing to sympathy for Clayton Chandler and Ina Morris during first stage closing argument; demeaning and devaluing the Petitioner's mitigation evidence during second stage closing argument, and offering derogatory personal opinions about it which were outside the record; improper comparison of the value of the victim's life with that of the Petitioner during second stage closing argument; solicitation of inadmissible evidence of victim impact from Ina Morris during the second stage, and argument of that evidence during closing argument.

Ground 9:       Admission of victim impact evidence at the Petitioner's trial violated the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, by introducing an arbitrary, irrelevant and invalid aggravating factor into the sentencing process.

Ground 10:      The Petitioner was denied his rights under the Fifth, Eighth and Fourteenth Amendment[s] to the United States Constitution by his sentence of death in case CF-75-2181 based on the finding of great risk of death to more than one person aggravating circumstance. The factor was unsupported by sufficient evidence, and it is vague, overbroad, and fails to meaningfully narrow, channel and guide the sentencer's discretion.

Ground 11:      The Petitioner was denied due process of law, a fair jury trial and a reliable capital sentencing determination, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, by the prosecution's presentation of inadmissible and prejudicial evidence to support the continuing threat aggravating circumstance, including uncorroborated confessions as to other robberies, and evidence relating to the stabbing of Neomah Wilson by Richard Dodson.

Ground 12:      The Petitioner was denied due process of law, a fair jury trial and a reliable capital sentencing determination, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, by the failure to conduct individual sequestered voir dire of trial jurors.

Ground 13:      The Petitioner was denied the effective assistance of counsel in his prior federal habeas corpus action, case 91-C-826-E (N.D. Okla.), in violation of 18 U.S.C. § 3006A and the Sixth and Fourteenth Amendments to the United States Constitution, by reason of his appointed counsel's

10

prosecution of the federal constitutional challenge to the validity of his convictions in cases CF-75-2181, CF-75-2182, and CF-75-2183, without foreseeing and counselling [sic] the Petitioner about the legal possibility that a re-conviction and death sentence in CF-75-2181 might follow if such challenge proved successful.

Ground 14:    The Petitioner was denied his fundamental right to present a defense, in violation of the due process guarantee of the Fourteenth Amendment to the United States Constitution, when the trial court sustained the State's objection to questioning of witness Bervin Knott about the veracity and character for truthfulness of witness Richard Dodson.

Ground 15:    Execution of the sentence of death imposed in case CF-75-2181, after the Petitioner's incarceration since 1975 for the homicide charged in that case, would violate the Eighth and Fourteenth Amendments to the United States Constitution.

Ground 16:    Because the Petitioner's jury convicted him only of the elements of the lesser included offense [of] second degree murder, his conviction for first degree murder in case CF-75-2181 violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, placed him in double jeopardy, and denied him due process of law and jury trial.

Ground 17:    The Petitioner was denied the effective assistance of trial counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, to the extent that any of the claims asserted in the preceding sections are found not to have been raised by his trial counsel during trial proceedings.

Ground 18:     The Petitioner was denied the effective assistance of appellate counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, to the extent that any of the claims asserted in the preceding sections are found not to have been raised by his appellate counsel on direct appeal, as well as for failing to contend that the conviction in case CF-75-2181 should have been reduced to murder in the second degree.

See Dkt. # 17 at 5-12, ¶ 12.  In support of these grounds, Selsor asks the Court to "take judicial notice of, or otherwise bring before it the record of, all proceedings, including transcripts, exhibits and other filings, ever filed in Oklahoma Court of Criminal Appeals cases PC-2000-87, F-98-531, P-97-911, and F-76-578." Id. at 16, ¶ 18.  However, in the Joint Certification of State Court

11

Records filed by both Selsor and Respondent, counsel for the parties certified that the state court record before this Court is complete (Dkt. # 36). Accordingly, it is unnecessary for the Court to "take judicial notice of, or otherwise bring before it" any additional state court record documents. The record provided to the Court has been reviewed and considered in the analysis of Selsor's habeas corpus claims.

Concurrently with the filing of his petition, Selsor filed a brief "[i]n further support of the grounds alleged in paragraph 12." Id.; Dkt. # 18. In the supporting brief, Selsor provides argument and legal authorities in support of the following[6] ten (10) grounds of error:

Ground B:    The State violated the ban on double jeopardy by resentencing the Petitioner to death after imposing a life sentence for the same crime.

1.    The Oklahoma Court of Criminal Appeals used its statutory sentence review authority to choose a life sentence for Petitioner.

2.    Jeopardy terminated when the Oklahoma appellate court imposed a life sentence on the Petitioner.

3.    The Oklahoma court's disposition of the double jeopardy claim cannot be sustained.

4.    The Court should determine the State's retrial and resentencing options in its Order.

Ground C:    The State violated the constitutional prohibition on *ex post facto* laws by using post-1975 penal statutes to sentence the Petitioner to death.

1.    The current death penalty statute was applied retrospectively to the Petitioner.

---

[6]    Selsor identified his arguments in the brief using alphabetical letters, rather than numbers. His "A" section is devoted to the AEDPA standards of review, and the actual arguments supporting various grounds for relief begin with section "B". To avoid confusion, the Court has referred to the grounds as identified in the supporting brief.

2.      Because the current death penalty statute altered the elements of first degree murder, it was an *ex post facto* law.

3.      The repeal of the statutory proportionality requirement deprived the Petitioner of an important defense against the death penalty.

Ground D:      The State denied the Petitioner due process of law in his prosecution and sentencing.

1.      The Petitioner was denied fair warning as of the date of the offense.

2.      The Petitioner was denied fair warning before he launched the Federal attack on his convictions.

3.      The State unlawfully punished the Petitioner for exercising his right to seek Federal habeas corpus relief.

Ground E:      By singling out the Petitioner for a death sentence, the State denied him equal protection of the law.

Ground F:      It was unconstitutional to try and convict the Petitioner under an *ex post facto* murder statute, and to uphold that conviction on appeal on a theory never tried to the jury.

1.      Conviction and punishment of the Petitioner under § 701.7(A) violated the *ex post facto* clause, and could not be rescued by harmless error analysis.

2.      The appellate court's affirmance of the murder conviction violated the Petitioner's rights to due process, notice of charges and jury trial.

3.      The State violated the double jeopardy clause by convicting the Petitioner on appeal for felony-murder, after convicting and sentencing him at trial for the underlying felony.

Ground G:      Police obtained the Petitioner's statement in violation of the Fifth Amendment.

Ground H:      The State's inflammatory victim impact case violated the Sixth, Eighth and Fourteenth Amendments.

Ground I:      The prosecution engaged in misconduct which violated the Eighth and Fourteenth Amendments.

13

      1.      Misleading and prejudicial evidence and argument designed to inflame the jury.

      2.      Demeaning the Petitioner's mitigation case.

      3.      Improper arguments about the relative value of the Petitioner's life and the victim's life.

Ground J:      The trial court erred by refusing to conduct individual sequestered *voir dire*.

Ground K:      The Petitioner received ineffective assistance of trial and appellate counsel.

(Dkt. # 18).

In response to the petition, Respondent contends that the grounds not addressed in Selsor's supporting brief are not in compliance with Rule 2(c) of the Rules Governing Section 2254 Cases. Accordingly, Respondent argues that Selsor is not entitled to habeas corpus relief for any claims asserted in the petition that are unsupported by citations to the record or submissions of authority and argument. See Dkt. # 28 at 14. Selsor replies that he is in compliance with the rules, and is entitled to consideration of all claims identified in the petition even if not briefed in the supporting brief.  As to the ten (10) grounds (B-K) addressed in Selsor's supporting brief, Respondent claims that Selsor has not met his burden establishing entitlement to habeas relief under 28 U.S.C. § 2254(d).

## GENERAL CONSIDERATIONS

### I.     Exhaustion

Generally, federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. § 2254(b)(1)(A). Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977) (reviewing history of exhaustion requirement). In every habeas case, the Court must first consider exhaustion. Harris, 15 F.3d at 1554. "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991) (explaining that the exhaustion requirement is "grounded in principles fo comity"). Respondent contends that some of Selsor's claims are unexhausted. Therefore, the Court will address the threshold question of exhaustion as it arises in each ground.

### II.     Procedural Bar

The Supreme Court has also considered the effect of state procedural default on federal habeas review, giving strong deference to the important interests served by state procedural rules. See, e.g., Francis v. Henderson, 425 U.S. 536 (1976). Habeas relief may be denied if a state disposed of an issue on an adequate and independent state procedural ground. Coleman, 501 U.S. at 750. See also Medlock v. Ward, 200 F.3d 1314, 1322-23, 1028 (10th Cir. 2000).

A state court's finding of procedural default is deemed "independent" if it is separate and distinct from federal law. Ake v. Oklahoma, 470 U.S. 68, 75 (1985); Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998). If the state court finding is applied "evenhandedly to all similar claims," it will be considered "adequate." Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995) (citing Hathorn v. Lovorn, 457 U.S. 255, 263 (1982)).

To overcome a procedural default, a habeas petitioner must demonstrate either: (1) good cause for failure to follow the rule of procedure and actual resulting prejudice; or (2) that a fundamental miscarriage of justice would occur if the merits of the claims were not addressed in the federal habeas proceeding. Coleman, 501 U.S. at 749-50; Wainwright, 433 U.S. 72.

## III.    Standard of Review - AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions.  Title 28, Section 2254(d) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d), this Court may grant a writ of habeas corpus only if the state court reached a conclusion opposite to that reached by the Supreme Court on a question of law, decided the case differently than the Supreme Court has decided a case with a materially indistinguishable set of facts, or unreasonably applied the governing legal principle to the facts of the petitioner's case. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. It is not necessary, however that the state court cite to

16

controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court law. Early v. Packer, 537 U.S. 3, 8 (2002).

Selsor's habeas proceedings in the instant matter commenced  well after the effective date of AEDPA. Although the crime for which Selsor was convicted predates the law's enactment, the provisions of the Act govern pursuant to Lindh v. Murphy, 521 U.S. 320 (1997).  Therefore, to the extent Selsor's claims are cognizable in a federal habeas corpus proceeding, those claims shall be reviewed pursuant to § 2254(d).

## GROUNDS FOR RELIEF

### I.      Double jeopardy (Ground B)

In this ground for relief, Selsor claims that the death sentence entered at the conclusion of his second trial is barred by double jeopardy (Dkt. # 18 at 32).  He contends that the OCCA's 1977 modification of his sentence on direct appeal following his first trial had double jeopardy consequences. Id. at 34. In response, the Respondent argues that the Double Jeopardy Clause of the United States Constitution does not bar Selsor's more severe sentence on retrial because the reversal of his first conviction "wiped the slate clean." See Dkt. # 28 at 38.

In rejecting this claim on direct appeal after Selsor's second trial, the OCCA found:

This Court resolved the double jeopardy issue [in Selsor MA], finding that "if a defendant has not been acquitted of the death penalty and his conviction and sentence are reversed on appeal or collateral proceedings, the slate is wiped clean, and a defendant may be subjected to any punishment authorized by law, including death."

Selsor II, 2 P.3d at 349. The OCCA explained in a footnote that Selsor's slate was "wiped clean" because "his conviction and sentence were not reversed due to insufficient evidence." See id. at

n.11 (citing Salazar v. State, 919 P.2d 1120, 1127 (Okla. Crim. App. 1996) (relying on Poland v. Arizona, 476 U.S. 147, 157 (1996), and Bullington v. Missouri, 451 U.S. 430, 442 (1981))).

The Double Jeopardy Clause of the Fifth Amendment protects defendants against: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 717 (1969), *overruled in part by* Alabama v. Smith, 490 U.S. 794 (1989). Before the clause is implicated, however, some event, such as an acquittal, must terminate the original jeopardy. Richardson v. United States, 468 U.S. 317, 325 (1984).  In United States v. Ball, 163 U.S. 662 (1896), the Supreme Court declared the general rule, still applicable today, that the Double Jeopardy Clause does not bar retrial of a criminal defendant who successfully appeals his sentence. Ball, 163 U.S. at 672. As the Court itself has acknowledged, however, its double jeopardy cases in the century following Ball "can hardly be characterized as models of consistency and clarity." Burks v. United States, 437 U.S. 1, 9 (1978).  In Burks, the Court reaffirmed the general rule set forth in Ball, but overruled many of its prior cases to clarify the distinction between the double jeopardy effects of appellate reversal for insufficient evidence and appellate reversal for trial error. Carving out a narrow exception to the general rule established in Ball, the Court held that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient." Burks, 437 U.S. at 18. The Court has subsequently reemphasized the limited scope of the Burks exception. Tibbs v. Florida, 457 U.S. 31, 40 (1982) ( "[ Burks ] . . . carved a narrow exception from the understanding that a defendant who successfully appeals a conviction is subject to retrial.")

In a separate line of cases, the Supreme Court has considered the more narrow question of whether jeopardy bars a death sentence when a murder defendant successfully appeals his initial conviction and is tried again. Commencing with <u>Stroud v. United States,</u> 251 U.S. 15 (1919), the Supreme Court found that a life sentence imposed in connection with the defendant's previous conviction raised no double jeopardy bar to a death sentence on retrial. <u>Id.</u> at 18. On several occasions, the Supreme Court has reaffirmed its position "that the Double Jeopardy Clause imposes no absolute prohibition against a harsher sentence at retrial after a defendant has succeeded in having his original conviction set aside." <u>Bullington,</u>, 451 U.S. at 438 (citing <u>Pearce</u>, 395 U.S. 711; <u>United States v. DiFrancesco</u>, 449 U.S. 117 (1980); <u>Chaffin v. Stynchcombe</u>, 412 U.S. 17 (1973); and <u>Stroud</u>, 251 U.S. at 15)). Unlike the defendants in the earlier cases, however, the <u>Bullington</u> defendant was provided a second stage proceeding during his first trial in which the prosecution was required to prove, beyond a reasonable doubt, facts to justify the requested death sentence. The Supreme Court determined that the Double Jeopardy Clause barred the State from seeking the death penalty on retrial because the first jury's life sentence recommendation served as an acquittal of "whatever was necessary to impose the death sentence." <u>Bullington</u>, 451 U.S. at 445. The Court emphasized that in order to give rise to double jeopardy protections, an "acquittal" at a trial-like sentencing phase is required. <u>Id.</u> at 446.

In <u>Arizona v. Rumsey</u>, 467 U.S. 203 (1984), the Supreme Court expanded <u>Bullington's</u> rationale to cases in which a court, rather than a jury, is the factfinder resulting in an acquittal on the merits of a punishment issue. <u>Rumsey</u> "reaffirmed that the relevant inquiry for double-jeopardy purposes was not whether the defendant received a life sentence the first time around, but rather whether a first life sentence was an 'acquittal' based on findings sufficient to establish

legal entitlement to the life sentence - *i.e.*, findings that the government failed to prove one or more aggravating circumstances beyond a reasonable doubt." Sattazahn v. Pennsylvania, 537 U.S. 101, 108 (2003).

Two years after Rumsey, the Supreme Court found that the Double Jeopardy Clause was not implicated when the Arizona Supreme Court set aside the convictions and death sentences of two defendants because their jury considered non-record evidence. Poland v. Arizona, 476 U.S. 147 (1986). Upon retrial, both defendants were again convicted of first degree murder and sentenced to death. The Supreme Court concluded that neither the judge nor the jury had "acquitted" the defendants in the first trial by entering findings sufficient to establish legal entitlement to a life sentence. Id. at 155-57.

In the case before this Court, Selsor was convicted in his first trial of first degree murder. At the time of the crime, the only punishment in Oklahoma for first degree murder was death, so there was no sentencing phase. Okla. Stat. tit. 21, § 701.3 (Supp. 1973) (repealed in 1976). In 1976, the Supreme Court struck down mandatory death penalty statutes similar to that of Oklahoma. See Woodson v. North Carolina, 428 U.S. 280 (1976); Roberts v. Louisiana, 428 U.S. 325 (1976). Accordingly, the OCCA concluded in Riggs, 554 P.2d at 827, that Oklahoma's mandatory death penalty provision had been effectively stricken from the first degree murder statute. In Riggs, the state appellate court found that the portion of Oklahoma's first degree murder statute allowing the OCCA to modify sentences was not affected by the unconstitutional death penalty section, and modified the death sentences of affected prisoners to life imprisonment. Id. Citing Riggs in Selsor's first direct appeal, the OCCA modified Selsor's death sentence to life imprisonment. Selsor I, 562 P.2d at 927, 931.

Selsor argues that the sentence modification by the OCCA triggered the Double Jeopardy Clause barring later efforts to impose a death sentence because there was a judicial determination that death was not the appropriate punishment for the murder committed by Selsor. Citing Bullington, Rumsey, and Cabana v. Bullock, 474 U.S. 376 (1986), *abrogated by* Pope v. Illinois, 481 U.S. 497 (1987), Selsor contends that the OCCA's decision in Selsor II unreasonably applied Supreme Court law because jeopardy terminated once the OCCA made a judicial determination in Selsor I that death was not the appropriate punishment for the homicide. See Dkt. # 18 at 36-37. Selsor's position ignores important distinctions in the procedural history of the cited cases and his own case history. As recently summarized by the Supreme Court, "[u]nder the Bullington line of cases . . . , the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.'" Sattazahn, 537 U.S. at 109. Unlike Selsor's first trial, the jury in Bullington's first trial reached a factual conclusion that the state had not proven its case for the death penalty. Likewise, in Rumsey, the trial judge made a factual determination that the aggravating circumstances required for a death sentence were not proved by the state.

Citing Poland, 476 U.S. at 155, Selsor recognizes that the correct inquiry is "whether the sentencer or reviewing court has decided that the prosecution has not proved its case that the death penalty is appropriate." See Dkt. # 18 at 39, # 32 at 7.  Contrary to Selsor's argument, however, the OCCA did not decide that the prosecution failed to prove its case that the death penalty is appropriate (Dkt. # 32 at 10). The OCCA's modification of Selsor's sentence in Selsor I was not an "acquittal." Because Oklahoma's death penalty statute in existence at the time had been declared unconstitutional, the OCCA simply exercised its authority to modify Selsor's sentence. This Court concludes that jeopardy did not attach to the life sentence given to Selsor in his first

21

direct appeal. Because the Double Jeopardy Clause is not implicated, the OCCA's rejection of Selsor's double jeopardy challenge was neither contrary to nor an unreasonable application of Supreme Court precedent.  Under 28 U.S.C. § 2254(d), Selsor is not entitled to habeas corpus relief on this claim.

## II.      Ex post facto (Grounds C, F)

Article I, Section 10, Clause 1 of the United States Constitution prohibits states from enacting any "ex post facto law." An ex post facto law is any law that, among other things, "(1) makes conduct criminal that was legal when done, or (2) inflicts greater punishment for an offense than the law existing when the offense was committed." McDonald v. Champion, 962 F.2d 1455, 1457 (10th Cir. 1992) (citing Miller v. Florida, 482 U.S. 423, 429 (1987)).   A retroactive application of law must disadvantage the defendant to constitute an ex post facto violation.  United States v. Orr, 68 F.3d 1247, 1252 (10th Cir. 1995); see also Lynce v. Mathis, 519 U.S. 433, 433 (1997) (citing Weaver v. Graham, 450 U.S. 24, 29 (1981) (finding critical elements that must be present for a law to be ex post facto are that it applies to events occurring before its enactment and must disadvantage the offender affected by it)).

Selsor presents two separate claims that his constitutional rights under the ex post facto clause have been violated. First he challenges the use of post-1975 statutes to sentence Selsor to death (Ground C). Second, he alleges that it was unconstitutional to convict him for first degree murder under a statute which was not enacted until after the murder was committed (Ground F). For the reasons discussed below, the Court finds that Selsor's ex post factor arguments are unavailing. Contrary to his various claims, he has not been disadvantaged.

22

A.    **Challenge to death sentence**

In Ground C, Selsor argues that the use of post-1975 statutes to sentence him to death for a crime committed in 1975 violated his constitutional rights. Specifically, he contends that the sentencing statute was wrongly applied retrospectively because: (1) the sentencing provisions of the newer statute could not be severed from the law's ex post facto change in the elements of first degree murder; and (2) he was denied a defense provided in the earlier statute which required the OCCA to review punishment for proportionality. Respondent responds that the OCCA properly adjudicated the first claim, but the second claim is unexhausted because it was never presented to the state courts for consideration.

1.    **Changed elements**

In the first part of Ground C, Selsor contends that the elements of the 1976 law eliminated some of the essential elements of first degree murder found in the statute under which he was first convicted. Because the sentencing provisions of the 1976 law could not be severed from the 1976 murder statute, Selsor argues that his death sentence under the 1976 law was an ex post facto violation. The Oklahoma statute[7] in effect at the time of Selsor's crimes established the applicable elements of first degree murder as: (1) a homicide perpetrated with a premeditated design to effect the death of the person killed; and (2) when perpetrated by one committing an armed robbery. Okla. Stat. tit. 21, § 701.1 (2) (Supp. 1973) (repealed in 1976). The only punishment provided in this 1973 first degree murder statute was death. Okla. Stat. tit. 21, § 701.3 (Supp. 1973) (repealed in 1976).  In his first trial, Selsor was convicted and sentenced to death under the 1973 law.

---

[7]      Selsor was originally charged by Information for first degree murder under Okla. Stat. tit. 21, § 701.1 (2) (Supp. 1973). See O.R. Vol. I at 10. The record does not reflect that the Information was ever amended before Selsor's 1998 retrial.

23

In 1976, the Oklahoma legislature redefined first degree murder, as follows:

A.      A person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

B.      A person also commits the crime of murder in the first degree when he takes the life of a human being, regardless of malice, in the commission of forcible rape, robbery with a dangerous weapon, kidnapping, escape from lawful custody, first degree burglary or first degree arson.

Okla. Stat. tit. 21, § 701.7 (A), (B). As noted by Selsor, the 1976 revised statute created two categories of first degree murder: malice aforethought and felony murder. Section 701.7 was again modified in 1998, with the addition of more felonies to the second category and new categories identified in subsections (C) and (D). See Dkt. # 18, Ex. 9. Selsor contends that, in his second trial, the revised statute was used unconstitutionally because it altered the nature of first degree murder by redefining and eliminating elements (Dkt. # 18 at 44). He claims he was disadvantaged because the State was required to prove fewer elements at his retrial in order to secure a conviction.

The penalty provisions accompanying the 1976 first degree murder statute provided for "punishment by death or by imprisonment for life." See Okla. Stat. tit. 21, § 701.9 (A) (1976). Selsor argues that this post-1975 penal legislation attached only to the altered first degree murder statute, and could not lawfully be used to impose a death sentence on him for an offense which occurred before its enactment (Dkt. # 18 at 44-45).

The OCCA addressed this issue on direct appeal, as follows:

Precisely as in *Selsor v. Turnbull* [Selsor MA], Selsor here argues in Proposition II that the retroactive application of the current death penalty statute violates *ex post facto* provisions and equal protection. This Court's analysis in *Selsor v. Turnbull* is dispositive. First, this Court determined that the retroactive

24

application of the current death penalty statutes did not violate the *ex post facto* provision of the State and Federal Constitutions because the "newly enacted death penalty statutes (1) did not increase[8] the elements of First Degree Murder, (2) did not increase but in fact decreased the conditions and quantum of punishment, and (3) did not decrease but in fact increased the quantity and degree of proof necessary to establish guilt."

Selsor II, 2 P.3d at 349 (citing Selsor MA, 947 P.2d at 582-83). In Selsor MA, the OCCA

explained its ex post facto reasoning in greater detail:

After this Court attempted to construe federal *ex post facto* law in *Riggs*, the United States Supreme Court directly addressed the issue of whether the *ex post facto* clause prohibited the application, of newly enacted statutes for imposing the death penalty, to defendants whose crimes were committed prior to the enactment of the new statutes. Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In its *ex post facto* analysis, the Supreme Court compared the newly enacted statutes to the statutes in effect on the date the crime was committed, even though the old statutes, like Section 701.3, had been declared unconstitutional. The United States Supreme Court held the changes in death penalty statutes were procedural and on the whole ameliorative, and could be applied retroactively without an *ex post facto* violation. *Id.*

In different contexts, this Court has adopted and applied the reasoning and analysis of *Dobbert*. Cartwright v. State, 778 P.2d 479 (Okl. Cr. 1989). This Court has acknowledged an *ex post facto* argument is not won by proving disadvantage alone. Cartwright, 778 P.2d at 482. In addition, the true focus of *ex post facto* analysis is on (1) the elements of the offense, (2) the conditions and quantum of punishment, and (3) the quantity and degree of proof necessary to establish guilt. *Id.*

Contrary to Petitioner's arguments, there was a death penalty statute in effect in 1975, and on the date his crime was committed, in the form of 21 O.S.Supp.1973, § 701.3. Contrary to this Court's analysis in *Riggs*, the newly enacted death penalty statutes did not change the burden of proof to the detriment of Riggs and other

---

[8]     It appears to this Court that the OCCA intended to mean "did not decrease" the elements of First Degree Murder. A decrease in the elements required to be proven would disadvantage a defendant, while an increase in elements would make it more difficult for the State to prove commission of the crime. The OCCA also referenced an "increase" in elements in Selsor MA, but it is clear from the discussion in Selsor MA that the court was referring to the fact that the newly enacted death penalty statutes increased the burden of proof on the State. Thus, the elements required to be proven actually increased. See Selsor MA, 847 P.2d at 582-83.

defendants, as compared to the burden of proof under Section 701.3. Under Section 701.3, the only available sentence was death. Under newly enacted death penalty statutes, the sentencing options increased in favor of a defendant to include not only death but also the possibility of life imprisonment, and now life without parole. 21 O.S.Supp.1976, §§ 701.9 and 701.10; 21 O.S.1991, § 701.9, and Supp.1996, § 701.10. Under Section 701.3, the State was only required to prove the elements of the crime of First Degree Murder. Once those elements were proven, the State had no further burden of proof because the death penalty was required. Under newly enacted death penalty statutes, the State not only must prove the same elements of the crime of First Degree Murder, but also must prove aggravating circumstances before the death penalty can be imposed. *Id.* Therefore, newly enacted death penalty statutes (1) did not increase the elements of the offense of First Degree Murder, (2) did not increase but in fact decreased the conditions and quantum of punishment, and (3) did not decrease but in fact increased the quantity and degree of proof necessary to establish guilt, and are not ex post facto. *Dobbert, supra; Cartwright, supra.* The *ex post facto* analysis and the holdings thereunder in <u>Riggs v. Branch</u>, 554 P.2d 823 (Okl.Cr.1976) are hereby overturned.

<u>Selsor MA</u>, 947 P.2d at 582-83. Respondent takes the position that the OCCA's adjudication of this issue did not result in a decision that was contrary to or involved an unreasonable application of Supreme Court jurisprudence (Dkt. # 28 at 44).

Selsor asks this Court to find that, because the 1973 death penalty statute was later found to be unconstitutional, and application of the newer first degree murder statute is a violation of ex post facto principles, his death sentence cannot stand. The Supreme Court rejected a similar argument in <u>Dobbert</u>:

Petitioner's second ex post facto claim is based on the contention that at the time he murdered his children there was no death penalty "in effect" in Florida. This is so, he contends, because the earlier statute enacted by the legislature was, after the time he acted, found by the Supreme Court of Florida to be invalid under our decision in <u>Furman v. Georgia</u>, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Therefore, argues petitioner, there was no "valid" death penalty in effect in Florida as of the date of his actions. But this sophistic argument mocks the substance of the Ex Post Facto Clause. Whether or not the old statute would in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum

26

deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.

Dobbert, 432 U.S. at 297-98. In concluding that the changes to Florida's law were not an ex post facto violation, the Dobbert Court looked to see whether, "[t]he crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute." Id. at 294 (quoting Hopt v. Utah, 110 U.S. 574, 589-90 (1884)). The Dobbert Court also noted that Florida's change in law was ameliorative, and was not more onerous than the prior law. Id.

In the instant case, as in Dobbert, the Oklahoma statute in effect at the time Selsor murdered Clayton Chandler allowed death as the only possible punishment. Despite substantive changes in Oklahoma's murder statutes, Selsor's crime in 1975 was first degree murder and still is first degree murder. Further, in 1975 death was and, under the new statute, still is the maximum punishment for the crime. The remaining question is whether the quantity or degree of proof necessary to establish guilt was unchanged by the new statute. The OCCA resolved this issue in Selsor MA, and reiterated its position in Selsor II, finding that the change in law did not lessen the quantity or degree of proof necessary to establish guilt. Selsor II, 2 P.3d at 350. Respondent points out that the elements of the offense alleged against Selsor included all the elements of both first degree malice aforethought murder and felony murder (Dkt. # 28 at 52). Thus, Respondent contends that although the statutory elements for first degree murder changed from the 1973 statute to the post-1975 statute, the State's burden to prove the elements was not lessened because the jury was instructed on all the elements of both malice aforethought and felony murder. Id. at 53-54.

27

The Court agrees. Selsor's second jury found him guilty beyond a reasonable doubt of first degree murder and robbery with a firearm. In order to find him guilty of first degree murder, jurors at the second trial were instructed they must find Selsor caused: (1) the death of a human; (2) which was unlawful; (3) and with malice aforethought. See Instruction No. 9, O.R. Vol. III at 363. To find him guilty of robbery with a firearm, jurors were required to find that Selsor committed a wrongful taking, carrying away of personal property of another from the person of another by force/fear through use of a loaded firearm. See O.R. Vol. III at 372, Instruction No. 18. Although stated somewhat differently, the elements of the two crimes were encompassed within the definition of first degree murder found in § 701.1 (2) of the 1973 first degree murder statute. Further, at Selsor's second trial, the State was required to prove beyond a reasonable doubt that certain aggravating circumstances outweighed mitigating evidence in order to obtain a sentence of death. The Court finds that the State did not have a lesser burden to obtain its first degree murder conviction and death sentence against Selsor at his second trial.

The Court also agrees with the OCCA that the sentencing options under the post-1975 statute increased in favor of Selsor. "It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." Dobbert, 432 U.S. at 294. The OCCA's resolution of Selsor's claim that his death sentence was a violation of ex post facto law was not contrary to or an unreasonable application of Supreme Court law. 28 U.S.C. § 2254(d)(1). Selsor is not entitled to habeas corpus relief on this portion of his Ground C claim.

### 2.      Denial of proportionality review

In the second part of his Ground C ex post facto claim, Selsor asserts that his constitutional rights were violated because the OCCA did not perform a proportionality review in his second

direct appeal. Under Okla. Stat. tit. 21, § 701.5-6 (Supp. 1973) (repealed in 1976), the OCCA was required to review a judgment and sentence of death. As part of its review, it was necessary for the state appellate court to "determine whether the sentence of death is substantially disproportionate to the penalty imposed in similar cases." Id. at § 701.5. If found to be substantially disproportionate, the OCCA "shall modify the sentence of death to life in the penitentiary at hard labor." Id. at § 701.6. The requirement for a proportionality review was not included in the revised death penalty statutes.

Respondent contends that this portion of Selsor's Ground C claim is unexhausted, but is without merit. Selsor replies that he presented this claim to the OCCA in his mandamus action filed as OCCA Case No. P-97-911. The Court has reviewed the arguments Selsor presented to the state court in his mandamus action and found no argument related to proportionality review. His general mandamus claim that applying the new death penalty statute to events occurring in 1975 disadvantaged him in light of Riggs and Selsor I did not fairly present the substance of his more specific federal habeas proportionality claim to the state court. See Thomas v. Gibson, 218 F.3d 1213, 1221 n.6 (10th Cir. 2000) (holding petitioner's general state court ineffective assistance claim was insufficient to exhaust his later, more specific federal habeas claim). Thus, the Court agrees with Respondent that Selsor's habeas claim that he was deprived of a proportionality review in violation of his constitutional rights is unexhausted.

Federal courts generally should dismiss habeas petitions containing unexhausted claims. Rose v. Lundy, 455 U.S. 509, 510 (1982). Nonetheless, this Court may "deny relief on the merits of a claim even if that claim has not been exhausted in state court." Spears v. Mullin, 343 F.3d 1215, 1234 (10th Cir. 2003); 28 U.S.C. § 2254(b)(2). Interests of comity and federalism underlie

29

this principle, as well as avoiding litigation in state courts. Hoxsie v. Kerby, 108 F.3d 1239, 1242

(10th Cir. 1997) (citing Granberry v. Greer, 481 U.S. 129, 134 (1987)). In this case, the Court

finds that the unexhausted portion of  Ground C should be denied on the merits. 28 U.S.C. §

2254(b)(2).

In determining whether the change in the sentencing statute complained of by Selsor

constituted an ex post facto violation, the Court looks to the effect of the statute, rather than the

form. Barnes v. Scott, 201 F.3d 1292, 1296 (10th Cir. 2000) (citing Weaver v. Graham, 450 U.S.

24, 31 (1981)).  Removal of the proportionality review requirement from Oklahoma's sentencing

statute did not alter the crime for which Selsor was charged, increase the maximum punishment

prescribed for that crime, or change the quantity or level of proof necessary to convict him. See

Barnes, 201 F.3d at 1296. At the time Selsor committed the crime of murder, he was on notice that

the possible sentence upon conviction was death. Removing the requirement of a proportionality

review by the OCCA did not result in a punishment more onerous than the previous law. See

Dobbert, 432 U.S. at 294 (holding it "axiomatic that for a law to be ex post facto it must be more

onerous than the prior law"). Accordingly, application of Oklahoma's newer penal statute did not

result in an ex post facto violation and the second part of Selsor's Ground C is without merit.

**B.     Challenge to murder conviction**

In Ground F, Selsor complains that his murder conviction under the statute enacted after

the crime violated ex post facto principles. He argues: (1) his conviction and sentence under Okla.

Stat. tit. 21, § 701.7 violated the ex post facto clause and is not subject to harmless error analysis;

(2) the OCCA's decision violated his rights to due process, notice of the charges against him and

to a jury trial when it affirmed his conviction; and (3) his conviction for felony murder violated

30

double jeopardy because he was also convicted of the underlying felony. Respondent responds that

the first and second parts of Selsor's claim are unexhausted because they were not presented to

the OCCA for review. Alternatively, he argues that all three subparts fail on the merits.

### 1.    Harmless error analysis

Selsor claims that the constitutional ban on ex post facto laws was violated when he was

convicted of first degree murder under a statute enacted after the crime was committed.   In

denying relief on this ex post facto claim, the OCCA explained in a footnote that:

> Pursuant to 21 O.S. Supp 1973, § 701.1, the jury had to find that Selsor (1) killed
> a human being, (2) with a premeditated design to effect death, (3) without authority
> of law, (4) while committing robbery with a firearm. In Instruction 9, Selsor's jury
> was instructed on First Degree Murder pursuant to 21 O.S. 1991, § 701.7(A), under
> which the jury had to find that Selsor (1) unlawfully caused the death of a human,
> (2) with malice aforethought. While it appears that the "premeditated design" and
> "malice aforethought" elements differ, this Court has concluded they are
> interchangeable. *Conover v. State*, 1997 OK CR 6, 933 P.2d 904, 910.
> Additionally, the murder had to be committed in the course of the robbery.
> Instructions 9 and 18 omit this requirement. However, this was harmless beyond
> a reasonable doubt because the facts at trial established Selsor committed the
> murder in the course of the robbery.

Selsor II, 2 P.3d at 350 n.16.  Selsor argues in the instant case that the OCCA improperly used a

harmless error analysis in its reasoning. He contends that the ex post facto claim could not be

analyzed under harmless analysis standards because it constituted a structural error and not a trial

error. Respondent first argues that this issue is unexhausted. However, the Court interprets Selsor's

position as an AEDPA argument that the OCCA's decision, partially resting on harmless error

reasoning, was an unreasonable application of Supreme Court law. Alternatively, upon review of

the merits, Respondent states that there was no error at all, because the instructions at trial

demonstrate that Selsor was not convicted under the later statute. Thus, Respondent concludes,

it is unnecessary to address the harmless error argument.  Because the Court interprets Selsor's

argument as a challenge to the OCCA's application of the law to his ex post facto claim, AEDPA standards will be applied in an analysis of the issue.

A constitutional error is either structural or it is not. Neder v. United States, 527 U.S. 1, 14 (1999). However, it is first necessary to find constitutional error before categorizing it as structural or not.  In this case, the OCCA determined that there was no constitutional ex post facto violation because Selsor's jury was "instructed upon and found him guilty of all the elements of First Degree Murder under the applicable 1973 statute." Selsor II, 2 P.3d at 350.  Because Selsor was charged with first degree murder for a crime committed in 1975, his jury should have been instructed according to the law in effect at the time he committed the crime.  As noted in Section II.A. above, the Oklahoma statute in effect at the time of Selsor's crimes established the applicable elements of first degree murder as: (1) a homicide perpetrated with a premeditated design to effect the death of the person killed; and (2) when perpetrated by one committing an armed robbery. Okla. Stat. tit. 21, § 701.1 (2) (Supp. 1973) (repealed in 1976). Instead, his jury was instructed that a first degree murder conviction required them to find beyond a reasonable doubt that Selsor unlawfully and with malice aforethought caused the death of a human. See O.R. Vol. III at 363. To convict for robbery with a firearm, the jury was required to find that Selsor wrongfully took the property of another by force/fear through use of a loaded firearm. The jury in Selsor's second trial returned guilty verdicts for both first degree murder and robbery with a firearm.

"A misstatement of an element in jury instructions is subject to harmless error analysis on habeas review." Gardner v. Galetka, 568 F.3d 862, 884 (10th Cir. 2009) (quoting Scoggin v. Kaiser, 186 F.3d 1203, 1207 (10th Cir. 1999)).  Further, the error is harmless if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."

Gardner, 568 F.3d at 885 (quoting Neder, 527 U.S. at 15). The OCCA observed that all the elements of first degree murder under the 1973 statute were not contained within Instruction 9 (the instruction explaining the elements of first degree murder), but they were included within the instructions as a whole. Selsor II, 2 P.3d at 350. The state appellate court further concluded that, "considering Instructions 9 and 18 together indicates that Selsor's jury was instructed upon and found him guilty of all elements of First Degree Murder under the applicable 1973 statute." Id. In response to Selsor's observation that the instructions omitted a specific requirement that the murder had to be committed during the course of the robbery, the OCCA found the omission harmless beyond a reasonable doubt "because the facts at trial established Selsor committed the murder in the course of the robbery." Id. at n.16. Upon review of the trial transcript and record, this Court agrees that the failure of the instructions to mirror the exact language of the 1973 first degree murder statute did not contribute to the guilty verdicts. Neder, 527 U.S. at 15. Nothing in the evidence would suggest that the guilty verdict returned by the jury on the armed robbery charge arose from any facts other than the September 15, 1975, robbery at the U-TOTE-M store which also resulted in the killing of Clayton Chandler.

Insofar as Selsor may be challenging the OCCA's decision regarding the instructions given, his challenge is without merit.  "As a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, 'unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law.'" Nguyen v. Reynolds, 131 F.3d 1340, 1357 (10th Cir. 1997) (quoting Long v. Smith, 663 F.2d 18, 23 (6th Cir. 1981)); see also Maes, 46 F.3d at 984 ("A state trial conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of

rendering the trial so fundamentally unfair as to cause a denial of a fair trial."). Selsor has failed to demonstrate that the instructions were so fundamentally unfair as to deprive him of a fair trial and to due process of law. Therefore, the OCCA's denial of relief on Selsor's claim and conclusion that certain instructional errors were harmless was not an unreasonable application of Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the evidence presented at trial. 28 U.S.C. § 2254(d)(1),(2). Selsor is not entitled to habeas relief on this claim.

### 2.   Due process

Citing <u>Cole v. Arkansas</u>, 333 U.S. 196 (1948), Selsor next argues that his due process rights were violated because he was tried and convicted for violating a statute other than the one he was originally charged with violating. <u>See</u> Dkt. # 18 at 74. In <u>Cole</u>, the Supreme Court found that due process under the Sixth Amendment requires notice of a specific charge and a chance to be heard in a trial on issues raised by that charge. <u>Id.</u> However, Selsor was convicted and sentenced on the offense charged - first degree murder. The evidence in the case showed that all the elements were proven to support a finding of guilt as to either first degree murder under the 1973 statute, or first degree felony murder or malice aforethought murder under the 1976 statute. The evidence supported the conclusion that Selsor shot and killed Clayton Chandler during the robbery of a U-TOTE-M convenience store on September 15, 1975. Selsor was provided notice of the charges against him and an opportunity to be heard at trial on the issues raised by the charges. Further, contrary to Selsor's assertion, the procedure in the second trial did not impair his ability to defend against the statutory aggravating circumstance that the murder "was committed

for the purpose of avoiding or preventing a lawful arrest or prosecution." The Court finds no due process violation.

### 3.  Double Jeopardy

In this section of his ex post facto claim, Selsor argues that the Fifth Amendment prohibition against double jeopardy was violated when he was convicted of felony murder and robbery with a firearm. See Dkt. # 18 at 78. On direct appeal, the OCCA found this claim to be meritorious and granted relief as follows:

> However, as the State concedes, Selsor's Robbery with Firearms conviction must be dismissed based upon double jeopardy because all the elements of Robbery with Firearms are included within the elements of the [sic] First Degree Murder pursuant to the 1973 statute. Thus, Selsor's conviction for Robbery with Firearms is reversed and remanded with instructions to dismiss.

Selsor II, 2 P.3d at 351. In response to the petition, Respondent argues that as a result of the OCCA's ruling, this habeas claim has been rendered moot. The Court agrees. The OCCA's direction to dismiss Selsor's conviction for Robbery with Firearms has rendered moot Selsor's double jeopardy claim as asserted in this portion of Ground F. Because the OCCA granted Selsor all the relief to which he was entitled, this Court can grant him no further relief on this double jeopardy claim. See Stratmoen v. Ward, 248 Fed.Appx. 17, 20 (10th Cir. 2007) (unpublished).

To the extent Selsor objects to the OCCA's resolution of this claim, his reliance on Price v. Georgia, 398 U.S. 323 (1970), and Green v. United States, 355 U.S. 184 (1957), is misplaced. The Supreme Court in Price found double jeopardy had attached to a first degree murder charge because the defendant's first verdict was for the lesser included offense of voluntary manslaughter. Upon retrial, after the initial conviction was overturned, the Supreme Court determined that continuing jeopardy applied only to the lesser offense of voluntary manslaughter. Price, 398 U.S.

at 326-27. Similarly, in <u>Green</u>, the Supreme Court found that the defendant could not be retried on first degree murder after an earlier guilty verdict on the lesser included offense of second degree murder was set aside on appeal. <u>Green</u>, 355 U.S. at 191. Finding that jeopardy had attached to the first degree murder charge, the Court reasoned that (1) the first jury's verdict of guilty on the second-degree murder charges was an "implicit acquittal" on the charge of first degree murder, and (2) the first jury was given a full opportunity to return a verdict on first degree murder and instead reached a verdict on the lesser charge. <u>Id.</u> In Selsor's case, unlike <u>Price</u> and <u>Green</u>, the juries in both his first and second trial each reached the conclusion that Selsor was guilty of first degree murder. Accordingly, the Court finds that the cases cited by Selsor do not support his argument that he was subjected to double jeopardy.

The OCCA's resolution of this claim did not involve an unreasonable application of Supreme Court law nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)(2). Habeas corpus relief shall be denied.

## III.    Due process (Ground D)

Selsor next contends that his constitutional rights to due process were violated because: (1) he was denied fair warning as of the date of the offense that he would be sentenced to death under a later enacted statute which omitted his statutory defense requiring a proportionality review by the OCCA; (2) he was denied fair warning before he launched his first federal habeas proceedings that a successful resolution might result in a second death sentence; and (3) the State's decision to seek the death penalty after his successful habeas corpus decision was unconstitutionally vindictive. The OCCA rejected these claims in state proceedings.

In response to Selsor's assertion that he did not have fair warning, the OCCA stated that "Selsor was well aware of the charges against which he was to defend." Selsor II, 2 P.3d at 351, n.19. Finding that Selsor's conviction and sentence were not fundamentally unfair nor violations of due process, the state court further noted:

> Selsor was on notice and warned of the possibility of a death sentence based upon the original charge. Selsor then availed himself of the appeal process and gained a new trial, where he could have been acquitted and released or convicted and sentenced to death. Selsor knew the risks and benefits before he began the appellate process; he received a fair trial, and his punishment is consistent with the penalties he was warned of when he was charged.

Id. at 351.

Relying on Bouie v. City of Columbia, 378 U.S. 347 (1964), Selsor claims the unexpected judicial rulings of Selsor MA overruling Franklin v. State, 507 P.2d 917 (Okla. Crim. App. 1973) (finding that the death penalty statutes enacted after the date of an offense could not lawfully be applied retroactively), and Riggs, 554 P.2d 823 (finding that life imprisonment was the only lawful sentence after Oklahoma death sentence statute was found unconstitutional), deprived him of his constitutional right to due process of law.[9] He alleges prejudice because the unexpected overruling of Franklin and Riggs allowed the State to sentence him to death under a later statute which lacked the disproportionality defense. See Dkt. # 18 at 54-55. Although the Bouie decision holds that a judicial ruling may deny due process if it disadvantages an accused in the same manner as a prohibited ex post facto law, Bouie, 378 U.S. at 353-54, Selsor was not disadvantaged in that

---

[9]     Selsor's constitutional rights here derive from the Due Process Clause "because the law change at issue was by judicial construction; the prohibition against ex post facto laws applies only to legislative enactments." Coleman v. Safle, 869 F.2d 1377, 1385 (10th Cir. 1989) (citing Marks v. United States, 430 U.S. 188, 191-92 (1977)).

manner. As explained in Section II, A.2. above, deletion of a proportionality review by the OCCA on direct appeal did not constitutionally disadvantage Selsor in his second appeal.

Selsor next argues that he received no fair warning of the potential legal consequences when he filed his 1991 federal habeas corpus action. Citing Marks v. United States, 430 U.S. 188, 196 (1977) (due process clause precludes retroactive application of standards for isolating pornography from protected expression), Selsor contends he was entitled to rely on the Riggs decision as governing law before filing his successful habeas corpus action which led to a retrial and second death sentence. The holding in Marks, however, applies to a defendant's right to rely on standards in effect at the time he committed the crime - not when a defendant is deciding whether to appeal. Selsor has not provided, and the Court has not found, Supreme Court law finding a due process violation if a defendant relies on case law which is decided, and then overturned, prior to completion of an appeal. The OCCA's conclusion that Selsor's due process rights were not violated is not an unreasonable application of Supreme Court law.

Finally, Selsor asserts that the State's decision to seek the death penalty in his second trial was unconstitutionally vindictive. The OCCA rejected this claim in Selsor's state mandamus action, concluding: "[S]ubjecting Petitioner to the death penalty does not appear to be punishment for Petitioner's successful attack on his Judgment and Sentence, but merely an application of the correct law, and/or a correction of the applicable law." Selsor MA, 947 P.2d at 583.

Selsor challenges the OCCA's analysis, arguing that the State's efforts to impose a death sentence on him after his successful habeas corpus action was vindictive pursuant to Blackledge v. Perry, 417 U.S. 21 (1974). The Blackledge Court reviewed its prior decisions which "considered the constitutional problems presented when, following a successful appeal and reconviction, a

criminal defendant was subjected to a greater punishment than that imposed at the first trial." <u>Id.</u> at 25. Quoting its prior decision in <u>Pearce</u>, the Supreme Court observed that "vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." <u>Id.</u> at 25-26 (quoting <u>Pearce</u>, 395 U.S. at 725). In <u>Chaffin v. Stynchcombe</u>, 412 U.S. 17 (1973), the Supreme Court again concentrated on the issue of vindictiveness, finding no violation because the second jury was unaware of the original sentence and could not have been motivated to punish Chaffin for his successful appeal. <u>Id.</u> at 26. The <u>Blackledge</u> Court ultimately concluded that it was not constitutionally permissible for the State to respond to the defendant's successful appeal by bringing a more serious charge against him in the new trial. <u>Blackledge</u>, 417 U.S. at 28-29.  However, the <u>Blackledge</u> and <u>Chaffin</u> decisions are fundamentally distinct from Selsor's situation. First, Selsor was not subjected to a greater punishment on retrial than he obtained at his first trial. The State sought, and obtained, the death penalty in both the first and second trials. Although changes in the law over the passage of time during appeals provided Selsor a brief respite from death row, he has not provided any evidence that the State's decision to seek the death penalty on retrial was for vindictive reasons. Further, the only reason Selsor's second jury knew that his previous conviction had been overturned was because Selsor's counsel advised them of that fact. <u>See</u> Tr. Trans. Vol. II at 165-66. This Court concludes that the OCCA's decision on this issue was not an unreasonable application of Supreme Court law. Selsor is not entitled to habeas corpus relief on his due process claim.

IV.     **Equal protection (Ground E)**

Related to his double jeopardy and ex post facto claim is Selsor's argument based upon the

Equal Protection Clause of the Fourteenth Amendment.  As noted above, after the Oklahoma

legislature's decision to repeal the death penalty and the OCCA's decision in Riggs, the state

appellate court resentenced all prisoners, including Selsor, under sentences of death pursuant to

the 1973 statute to life imprisonment. Selsor argues that the imposition of the death sentence upon

him at his second trial denied him equal protection of the laws.  He advises, and the Respondent

does not dispute, that thirty-one prisoners were convicted of murder under the 1973 law. Thirty

of those convicted individuals received a sentence of life imprisonment, and Selsor is the only one

who later received a death sentence. See Dkt. # 18 at 65.

The OCCA rejected Selsor's equal protection claim on the merits in Selsor MA, finding:

> Petitioner's equal protection claim can be easily and summarily disposed of.
> Petitioner is simply no longer similarly situated to those defendants subject to
> Oklahoma's unconstitutional death penalty statute, 21 O.S. Supp. 1973, § 701.3,
> or to those defendants whose sentences were modified in accordance with *Riggs*.
> Petitioner's Judgment and Sentence has been vacated and he stands before this
> Court, similarly situated to defendants awaiting trial under current murder and
> death penalty statutes. Dobbert, 432 U.S. at 301, 97 S.Ct. at 2302, 53 L.Ed.2d at
> 361; *see also* Cheatham v. State, 900 P.2d 414, 428-30 (Okl.Cr. 1995).

Selsor MA, 947 P.2d at 583. The OCCA again rejected the claim when Selsor raised an equal

protection issue on direct appeal, quoting from its decision in Selsor MA. See Selsor II, 2 P.3d at

349.

The Equal Protection Clause "requires the government to treat similarly situated people

alike." Barney v. Pulsipher, 143 F.3d 1299, 1312 (10th Cir. 1998) (citing City of Cleburne v.

Cleburne Living Center, 473 U.S. 432, 439 (1985)). Selsor has not demonstrated that he was

treated differently from any similarly situated person whose pre-1976 murder conviction may have

40

been overturned. He does not point to any of the other defendants removed from death row after the <u>Riggs</u> decision who were successful on appeal and treated differently on retrial.[10] The Court does not find a violation of the Equal Protection Clause in the scenario described by Selsor. Because he has not demonstrated that the OCCA's decision was an unreasonable application of Supreme Court law, he is not entitled to habeas corpus relief on this claim.

## V.   <u>Miranda</u> violation (Ground G)

For his Ground G claim, Selsor alleges that the confession he gave to a California police officer upon his arrest did not follow the mandates of <u>Miranda v. Arizona,</u> 384 U.S. 436 (1966), and was improperly admitted into evidence at his second trial. He states that the officer tricked him into confessing by falsely answering Selsor's question asking if his statements would be repeated in court. Dkt. # 18 at 81.

Selsor admits that he did not raise a Fifth Amendment <u>Miranda</u> claim on direct appeal, explaining that it had been raised after his first trial where the state court ruled in post-conviction proceedings that the issues decided in his first appeal were *res judicata*.[11] <u>See</u> Dkt. # 18 at 83, n.14.

---

[10]   In his reply, Selsor claims that the OCCA barred imposition of the death penalty for a similarly situated Oklahoma homicide defendant, Richard Morris. <u>See</u> Dkt. # 32 at 35-36. However, a review of the Morris case reveals that the OCCA found that the charging document in his case only alleged facts which, if proven, would support a conviction of murder in the second degree. Thus, the OCCA instructed that, upon retrial, Morris could be charged and convicted of no higher degree of homicide than murder in the second degree. <u>Morris v. State</u>, 603 P.2d 1157, 1161 (Okla. Crim. App. 1979). The Court concludes that the facts in the Morris case were sufficiently distinct that it cannot be said he was similarly situated to Selsor upon retrial.

[11]   Selsor directs the Court's attention to the OCCA's Order affirming denial of post-conviction relief in Case No. PC-89-766, dated August 22, 1989. In that Order, the state appellate court denied relief on certain claims raised in the post-conviction proceedings by finding that all issues raised in the first direct appeal were *res judicata*. <u>See</u> Dkt. # 17, Ex. B.

Respondent contends that the issue is unexhausted and is subject to an anticipatory procedural bar.[12] As correctly noted by Respondent, the Miranda claim decided in Selsor I related to improper admission of Selsor's confession at his first trial, and is not the same claim as improper admission of Selsor's confession at the second trial. The Court agrees that the claim is unexhausted. However, this Court may "deny relief on the merits of a claim even if that claim has not been exhausted in state court." Spears, 343 F.3d at 1234; 28 U.S.C. § 2254(b)(2). Upon review of the record and consideration of the law, the Court concludes that Selsor's claim of a Fifth Amendment Miranda violation is without merit.

The Fifth Amendment provides that no person shall be compelled in any criminal case to be a witness against himself. In Miranda, the Supreme Court concluded that, "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda, 384 U.S. at 467. The Court admonished that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." Id. at 476. It is well settled that the Miranda warning is a constitutional requirement adopted to reduce the risk of a coerced confession and to implement Fifth Amendment protections. Dickerson v. United States, 530 U.S. 428, 444 (2000). "The purposes of the safeguards prescribed by Miranda are to ensure that the police do not coerce or trick captive suspects into confessing, to relieve the

---

[12]     A claim raised for the first time in federal habeas proceedings may be subject to an anticipatory procedural bar if the claim is technically unexhausted, but any attempt to present it to Oklahoma state courts would result in a procedural bar ruling under state law. See Anderson v. Sirmons, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007).

'inherently compelling pressures' generated by the custodial setting itself, 'which work to undermine the individual's will to resist,' and as much as possible to free courts from the task of scrutinizing individual cases to try to determine, after the fact, whether particular confessions were voluntary." Berkemer v. McCarty, 468 U.S. 420, 433 (1984) (internal citations and footnotes omitted). However, the Berkemer Court observed that, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Id. at n.20.

In this case, Selsor argues that improper tactics were used by the investigating officer to induce Selsor to make damaging admissions. According to the transcript of the 1975 Santa Barbara Police Department interrogation, Detective John Evans conversed briefly with Selsor about his lunch, Oklahoma, and other mundane matters before he began asking the following Miranda questions:

| | |
|---|---|
| DETECTIVE: | First of all, you have the right to remain silent, you understand that right? When you bow your head, do you mean yes? |
| SELSOR: Yeah. | |
| DETECTIVE: | Okay (chuckle). Anything you say can and will be used against you in a court of law. Do you understand that right? |
| SELSOR: Yes. | |
| DETECTIVE: | You have the right to talk to a lawyer and have him present with you while you are being questioned. Do you understand that? |
| SELSOR: Yes. | |
| DETECTIVE: | Okay. If you can't afford to hire a lawyer, one will be appointed to represent you before any questioning if you want one. Do you understand that right? |
| SELSOR: Yes. | |

43

> DETECTIVE:          Do you understand each of the rights I've just explained to you.
>
> SELSOR:     Yes.
>
> DETECTIVE:          Okay. Now, I've got to ask you, if, you having these rights in mind, do you want to talk to me about these incidents?

See Dkt.# 18, Ex. 15 at 5-6. Selsor responded to the last question with a question of his own, asking if he would be tried in California or be transported back to Oklahoma. Id. at 6. Detective Evans responded that he would be tried in Oklahoma, and asked again if Selsor wanted to "discuss some of these things" with him. Id. Selsor responds that he knows he is "gonna have to do a lot of time." Id.  Further conversation between the investigating officer and Selsor continues, with Officer Evans encouraging Selsor to talk to him because he looks like a man with a lot on his mind. Id. at 6-7. The following colloquy then occurs:

> SELSOR:     I don't know where to begin at though.
>
> DETECTIVE:          Where would you like to begin at. You do want to talk to me about this thing.
>
> SELSOR:     Yeah, I'll talk a little about it yeah.
>
> DETECTIVE:          Well, okay then. Why don't you go ahead and tell me how this all came about, you got so hard up for money.

Id. at 7. Selsor claims the next part of the interrogation constituted a violation of his Fifth Amendment rights:

> SELSOR:     Well, when I tell you about that, will it be said in court too or what.
>
> DETECTIVE:          Well, it's part of the rights, if we have to go back on this, and so on, you know. And, I would have to go to court on it. And then again, they may not want us back there. I don't know of any cases that have. Like I say, all I know is the information I got over the phone. I don't know what they're working with back there and I've got no idea. All I know is that your partner had a lot to tell me about this and I really kind of felt like it was a load off his mind. He sat down

44

and laid it out and he laid all these incidents with me and how they went down and what had happened on them. I'd basically like to talk with you and hear your side of the story and make sure that everything kind of equals up to the same thing he told me.

Id.  Selsor cites no federal law, other than Miranda, to support his claim that the detective's comments "tricked" Selsor into giving his confession. In his reply to Respondent's response, Selsor contends that he never waived his Miranda rights, and was tricked into talking about the crimes. See Dkt. # 32 at 56-58. The Court disagrees. After being read each of the Miranda rights, and responding affirmatively that he understood them, Selsor said "Yeah. I'll talk about it a little bit." See Dkt.# 18, Ex. 15 at 7. After being advised of his Miranda rights, an accused may himself validly waive his rights by an express statement that he is willing to make a statement. North Carolina v. Butler, 441 U.S. 369, 374 (1979). The Court concludes that Selsor's explicit statement that he would "talk about it a little bit" was a voluntary, knowing and intelligent waiver of his right to remain silent.[13] Because Selsor voluntarily waived his right to remain silent, the admission of his confession at the second trial was not a constitutional violation. Selsor's claim is without merit and he is not entitled to habeas relief on his Fifth Amendment Miranda claim.

## VI.    Victim impact evidence (Ground H)

Selsor next claims that his rights guaranteed by the Sixth, Eighth and Fourteenth Amendments were violated by victim impact evidence introduced during his trial, and by improper

---

[13]    The Court notes that immediately prior to opening statements for his second trial, on February 5, 1998, the trial court held a hearing pursuant to Jackson v. Denno,378 U.S. 368, 376 (1964) (holding that when a defendant challenges the voluntariness of a confession, the voluntariness issue should be decided by a separate hearing). After hearing testimony from the state's only witness, Officer John Evans, the trial court found that Selsor's confession had been knowingly and voluntarily made. See Tr. Trans. Vol. IV at 691-735. Selsor did not appeal the trial court's ruling to the state appellate court.

statements of the prosecutor inviting sympathy for Ina Morris and the family of the deceased victim.  He claims that the prosecution offered an "emotion-charged spectacle" which began with an emotional appeal during jury selection, continued during the trial's first stage, and concluded with dramatic and emotional victim impact evidence elicited from the homicide victim's family members. See Dkt. # 18 at 85-86. Relying on Payne v. Tennessee, 501 U.S. 808 (1981), and Woodson v. North Carolina, 428 U.S. 280 (1976), Selsor contends that the prosecution's emotional appeals to the jury and use of inflammatory victim impact evidence deprived him of his constitutional rights to a fair trial. Respondent argues that portions of Selsor's Ground H claim are unexhausted, but such portions should be denied on the merits. Insofar as the OCCA addressed Selsor's claims, Respondent asserts that the OCCA's decision was not contrary to, or an unreasonable application of, federal law.

### A.      Voir dire comments

Selsor first complains that the prosecution improperly invited jurors during the jury selection process to sympathize with the family of the homicide victim, Clayton Chandler. He objects to the prosecutor's questions asking prospective jurors to compare their own family situation to Mr. Chandler's, as in the following voir dire colloquy:

PROSECUTOR:      So just because we can't change what happened 23 years ago, does that, in your mind, excuse his behavior in the slightest?

JUROR:      Of course not.

PROSECUTOR:      Of course not. You're a parent, your kids depend on you.

JUROR:      You bet.

PROSECUTOR:      They come -- you come home at night, your kids run to you?

JUROR:      Yes.

46

| | |
|---|---|
| PROSECUTOR: | You bring home an income? |
| JUROR: | Yes, I do. |
| PROSECUTOR: | And your wife depends on you? |
| JUROR: | Yes, she does. |
| PROSECUTOR: | Do you think that is true with most families? |
| JUROR: | Yes. |
| PROSECUTOR: | Clayton Chandler's family, probably the same for them. You'd expect that, wouldn't you? |
| JUROR: | Yes. |

Tr. Trans. Vol. III at 619-20.  Selsor referenced this same portion of voir dire in his direct appeal, claiming prosecutorial misconduct. See Brief of Appellant in Case No. F-98-531 at 73. In his habeas brief, however, Selsor provides no argument or legal authority[14] supporting his claim that this portion of voir dire violated his constitutional rights other than to assert it was an emotional appeal by the prosecution for jurors to sympathize with the family of the homicide victim. See Dkt. # 84.  The Court will not craft Selsor's legal theories for him.  His undeveloped claim of constitutional violations based on the prosecutor's voir dire questions and comments is insufficient to convince the Court that a constitutional violation occurred. Even if the Court concluded that the prosecutor's remarks were undesirable or improper, they did not  "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477

---

[14]    Selsor lists several examples of evidence and argument he classifies as emotionally charged, including the voir dire reference. He concludes that such evidence and argument rendered his trial fundamentally unfair, citing Woodson v. North Carolina, 428 U.S. 280, 305 (1976). See Dkt. # 18 at 88.  However, Woodson, provides no support for this particular argument as it focused entirely on the constitutionality of North Carolina's mandatory death sentence statute.

U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)). Accordingly, habeas relief shall be denied on this portion of Ground H.

**B.       First stage closing argument**

Similarly, Selsor complains that the prosecutor improperly evoked sympathy for the surviving victim, Ina Morris, as well as Clayton Chandler during first stage closing argument. Citing several comments[15] made by the prosecutor, Selsor fails to provide legal support for his claim that the comments violated his constitutional rights. <u>See</u> Dkt. # 18 at 85. Respondent asserts that this claim is unexhausted (Dkt. # 28 at 82). Selsor replies that he raised the issue as part of his prosecutorial misconduct claim on direct appeal, stating that he "specifically identified the prosecutor's closing arguments concerning Chandler and Morris as a basis for the claim." <u>See</u> Dkt. # 32 at 60. Nonetheless, Selsor fails to provide sufficient argument or authorities to this Court supporting a claim that his constitutional rights were violated by the prosecutor's first stage closing argument comments.

An analysis of the merits of the claim reveals that Selsor's constitutional rights have not been violated by the prosecutor's comments during first stage closing arguments. The Court recognizes that "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," <u>Gardner v. Florida</u>, 430 U.S. 349, 358 (1977) (plurality opinion). However, it cannot be concluded

---

[15]      Selsor objects to the prosecutor reminding jurors during closing argument that Ina Morris was a 20 year old waiting for her husband to come pick her up and that Clayton Chandler was a 55 year old man waiting for his friend to come so they could have breakfast. Dkt. # 18 at 85. He also complains of the prosecutor's description of Ina Morris as having the courage and strength to survive. <u>Id.</u>

that the comments in question deprived Selsor of a fundamentally fair trial. See Bland v. Sirmons, 459 F.3d 999, 1028 (10th Cir. 2006); Le v. Mullin, 311 F.3d 1002, 1016 (10th Cir. 2002).

### C.    Testimony of Ina Morris

Selsor next argues that the prosecutor improperly solicited sympathy for victim Ina Morris during her testimony in both first and second stage proceedings. This claim was raised on direct appeal as part of Selsor's prosecutorial misconduct proposition. The OCCA ruled on the claim as part of its discussion on prosecutorial misconduct. This Court also finds that, although included in Selsor's habeas section on victim impact, the issue should be treated as a prosecutorial misconduct claim. Accordingly, the merits of this portion of his Ground H claim will be addressed below in the section on prosecutorial misconduct.

### D.    Second stage victim impact testimony

Next, Selsor contends that the victim impact testimony introduced during the trial's second stage was unconstitutionally improper under the parameters established in Payne v. Tennessee, 501 U.S. 808 (1991). At Selsor's trial, Clayton Chandler's daughter, Debbie Huggins, and his widow, Anne Chandler, provided victim impact testimony on behalf of the murder victim's family. Specifically, Selsor urges that the testimony of these two witnesses was unconstitutionally dramatic and emotional when they testified about the loss of Chandler and expressed their opinions that they were in favor of execution for Selsor. Citing Woodson, 428 U.S. at 290, Selsor argues the victim impact evidence rendered his trial fundamentally unfair and denied him a reliable sentencing determination. See Dkt. # 18 at 88.

Victim impact evidence is allowed under Oklahoma law. If a state chooses to allow the admission of victim impact evidence, the Eighth Amendment erects no *per se* bar. "A State may

legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne v. Tennessee, 501 U.S. 808, 827 (1991). In overruling its own previous split decisions in Booth v. Maryland, 482 U.S. 496 (1987), and South Carolina v. Gathers, 490 U.S. 805 (1989), the Supreme Court observed that, "assessment of the harm caused by the defendant has long been an important factor in determining the appropriate punishment, and victim impact evidence is simply another method of informing the sentencing authority about such harm." Payne, 501 U.S. at 808. Noting that in most cases, "victim impact evidence serves entirely legitimate purposes," the Payne Court concluded that such statements are "evidence of a general type long considered by the sentencing authorities." Id. at 825.  In 1992, Oklahoma enacted legislation permitting victim impact evidence. See Okla. Stat. tit. 21, § 701.10(c) (1992)[16] and Okla. Stat tit. 22, §§ 984, 984.1 (1992).[17] Although not constitutionally barred, victim impact statements remain subject to certain restrictions and limitations. Victim impact evidence cannot be "so unduly prejudicial that it renders the trial fundamentally unfair" in violation of the Due Process Clause of the Fourteenth Amendment. Short v. Sirmons, 472 F.3d 1177, 1192 (10th Cir. 2006) (quoting Turrentine v. Mullin, 390 F.3d 1181, 1200 (10th Cir. 2004)).

---

[16]     Section 701.10 (c) of Title 21 provides, "In the sentencing proceeding, . . .the state may introduce evidence about the victim and about the impact of the murder on the family of the victim."

[17]     Section 984 of Title 22 in effect at the time of Selsor's crime and trial defines "victim impact statements" as, "information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." Per section 984.1, copies of the victim impact statements are to be made available to the parties.

Selsor contends the words chosen by the victim impact witnesses were impermissibly dramatic and emotional. Dkt. # 18 at 86. The victim's daughter, Debbie Huggins, testified that the aftermath of the murder was a nightmare and that she became a "complete nervous wreck, actual physical illness to major depression." Tr. Trans. Vol. V at 1040. The victim's wife, Anne Chandler, described how she was forced to make a living and raise her youngest daughter by herself. Id. at 1044. She described the victim as a "loving and caring family man" whom she missed every day. Id. at 1045.

Selsor's challenge to the constitutionality of these statements was addressed by the OCCA on direct appeal. Citing Okla. Stat tit. 22, § 984, and Cargle v. State, 909 P.2d 806, 828 (Okla. Crim. App. 1995), *habeas relief granted by* Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003), the OCCA found:

> Selsor next argues that a portion of the victim impact evidence introduced through Debbie Huggins and Anne Chandler was prejudicial because it focused solely on the emotional impact of the victim's murder on those testifying. Selsor accordingly contends that the evidence should not have been admitted at trial because its prejudicial effect substantially outweighed its probative value. Selsor overstates his case. There was nothing inflammatory or prejudicial about the victim impact evidence introduced through Ms. Huggins and Ms. Chandler. This victim impact evidence, taken as a whole, fairly and concisely encompassed the financial, emotional, psychological, and physical effects of the murder on them and the uniqueness of the victim.

Selsor II, 2 P.3d at 352. Further, in its mandatory sentence review, the OCCA found:

> In accordance with 21 O.S. 1991, § 701.13(C), we must determine: i, whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and ii, whether the evidence supports the jury's finding of aggravating circumstances. Based upon the record, we cannot say Selsor's death sentence was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S. 1991, § 701.13(C).

Id. at 355.

51

The state appellate court based its ruling that there was nothing unconstitutional about the victim impact evidence introduced through Debbie Huggins and Anne Chandler on Oklahoma case law and statutes. The Cargle case applied the rule of law established by the Supreme Court in Payne v. Tennessee, 501 U.S. 808 (1991). In Cargle, the OCCA found the challenged victim impact statement "goes to the emotional impact of [the victim's] death" with no explicit testimony "as to the financial, psychological or physical effects of the crime on his family." Cargle, 909 P.2d at 835. Nonetheless, the OCCA concluded that the Cargle errors were harmless beyond a reasonable doubt. Id. In rejecting this claim on habeas corpus appeal, the Tenth Circuit concluded that the OCCA's decision in denying relief on this ground was not an unreasonable application of federal law. Cargle v. Mullin, 317 F.3d 1196, 1224 (10th Cir. 2003) (granting relief on other grounds).

It is clear that, insofar as the witnesses testified about the effect of Clayton Chandler's death on their lives, the victim impact testimony which Selsor now challenges was properly admitted and did not violate his constitutional rights to a fair trial. The OCCA's resolution of this issue was not an unreasonable application of federal law, as established by the Supreme Court. 28 U.S.C. § 2254(d). Habeas relief shall be denied on this claim.

However, both Debbie Huggins and Anne Chandler ended their victim impact statements with, "I agree with the District Attorney's [Office] recommendations on this case." Id. at 1042, 1045. Selsor challenges the fact that they were allowed to "testify that they favored the Petitioner's execution." Dkt. # 18 at 87. Respondent responds that this complaint was not raised in state court proceedings and is unexhausted, but fails on the merits. The Court agrees.

Victim impact testimony commenting on an appropriate sentence for the defendant constitutes a violation of Selsor's due process rights. (Frank Duane) Welch v. Sirmons, 451 F.3d

675, 703 (10th Cir. 2006) (recognizing that characterizations and opinions by family members about the crime, the defendant, and the appropriate sentence are prohibited under <u>Booth</u> and <u>Payne</u>). This testimony was contrary to <u>Payne</u> and <u>Booth</u>,[18] resulting in a violation of Selsor's Eighth Amendment rights. Having acknowledged constitutional errors, however, this Court finds that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993). An error has a "substantial and injurious effect" if the Court is in "grave doubt" about the effect of the error on the jury's verdict. <u>Bland v. Sirmons</u>, 459 F.3d 999, 1009 (10th Cir. 2006) (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435 (1995)). Relevant factors to be considered include the importance of the questioned evidence to the State's case, whether the evidence was cumulative, and the strength of the State's case.

Several factors convince this Court that admission of the improper victim impact evidence in question was harmless error which does not warrant habeas relief. First, the evidence of Selsor's guilt was substantial. Second, the jury found the existence of two aggravating circumstances beyond a reasonable doubt before recommending the death penalty for Selsor. The jury found, based upon first stage evidence incorporated by reference in the second stage proceedings, that Selsor knowingly created a great risk of death to more than one person and that he committed the murder to avoid or prevent lawful arrest. The evidence supporting the two aggravating

---

[18]     The Tenth Circuit, along with several other circuits, has "expressly recognized that the portion of <u>Booth</u> prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in <u>Payne</u> and remains valid." <u>(Frank Duane) Welch v. Sirmons</u>, 451 F.3d 675, 703 (10th Cir. 2006) (citing <u>United States v. Brown</u>, 441 F.3d 1330, 1352 (11th Cir. 2006); <u>Humphries v. Ozmint</u>, 397 F.3d 206, 217 (4th Cir. 2005) (en banc); <u>Parker v. Bowersox</u>, 188 F.3d 923, 931 (8th Cir. 1999); <u>Hain v. Gibson</u>, 287 F.3d 1224, 1238-39 (10th Cir. 2002); <u>United States v. McVeigh</u>, 153 F.3d 1166, 1217 (10th Cir. 1998); <u>Woods v. Johnson</u>, 75 F.3d 1017, 1038 (5th Cir. 1996)).

circumstances, independent of the victim impact evidence, was ample. For these reasons, the Court

concludes that the statements made by the victim impact witnesses indicating they agreed with the

prosecutor's sentence recommendation did not have a substantial and injurious effect or influence

in determining the jury's sentencing verdict. Accordingly, this Court finds that the admission of the

improper aspects of the victim impact evidence was harmless error. See Welch, 451 F.3d at 704.

This portion of Selsor's claim is without merit.

### E.      Second stage closing argument

Selsor next claims that the prosecutor's second stage closing argument rendered his trial

fundamentally unfair when he emphasized the "victim impact theme." Dkt. # 18 at 87. Specifically,

Selsor objects to the following argument:

> Ina Morris. It was a tragedy. That night was a tragedy. She was on her knees, asking
> God to forgive her for her sins. She was shot repeatedly because he made a blood
> pact with his partner in crime to leave no witnesses. She has suffered, she has
> suffered. She lost everything. She lost her innocence, she lost her trust. She couldn't
> even function, ladies and gentlemen. It took years and years of counseling . . . . And
> he deserves this?

Tr. Trans. Vol. V at 1204. Selsor also argues that the following portion of the prosecutor's

argument was improper:

> He took Clayton Chandler from his family. His little girl did not get to see Daddy
> come home that night, When she went to the door to put her arms around dad, there
> was no dad. He took a husband. Her dreams were in that man. He took the father,
> took a pillar of this society. This was a good man. He didn't do anything to deserve
> to die like a dog in that store. The nightmare, he created a nightmare. You bet he
> did. They told you about it, and they lived every single day while he's doing this.
>
> Physical suffering. Clayton suffered. He suffered. You bet he did. The surviving
> family, her 29-year mate, the person she loved, her best friend, her provider, her
> security, her hero, he's gone. He lays right over there.

Id. at 1203-04. The OCCA denied relief on this claim finding that the prosecutor "cannot be condemned for arguing evidence as admitted at trial." Selsor II, 2 P.3d at 354. Selsor provides no specific argument that the OCCA's decision was an unreasonable application of Supreme Court law, and this Court is not convinced that the contested arguments made by the prosecutor affected Selsor's substantial rights or seriously affected the fairness of his trial. Even if the comments were inappropriate, they must be so severe as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice. See United States v. Young, 470 U.S. 1, 16 (1985). "Some emotion is inevitable in capital sentencing[,]" Coleman v. Brown, 802 F.2d 1227, 1239 (10th Cir. 1986), and the prosecutor's appeal to emotion based on the victim impact testimony was not sufficient to render the argument constitutionally improper. In light of the evidence, this Court is not persuaded that the prosecution's remarks denied Selsor a fair trial. Accordingly, habeas relief shall be denied on this claim.

### F.  Non-statutory aggravating circumstance

As his final claim under this section, Selsor argues that victim impact evidence operates as a non-statutory aggravating circumstance resulting in an unconstitutional distortion by the jury in the weighing process between aggravating and mitigating circumstances. Dkt. # 18 at 89. This claim was raised on direct appeal. In rejecting Selsor's arguments, the OCCA stated:

> Selsor concludes by arguing that victim impact evidence is a "super" aggravating circumstance present in every capital case, and adds that victim impact evidence negates the constitutionally-required narrowing function for Oklahoma's death penalty sentencing scheme. This issue has been addressed and rejected by this Court, [in Mollett v. State, 939 P.2d 1, 12 (Okla. Crim. App. 1997)] and Selsor's argument fails to persuade us otherwise.

55

Selsor II, 2 P.3d at 352. Selsor contends that the OCCA's ruling was contrary to Payne. The Court disagrees. Selsor's concerns about the jury's possible misuse of victim impact evidence in its deliberations is based upon mere speculation.

Selsor's jury was fully instructed as to its duties for determining punishment in the second stage proceedings (O.R. Vol. III at 394-418). In arriving at a determination of punishment, the jury was instructed to first determine whether any one or more of the four aggravating circumstances existed beyond a reasonable doubt (Id. at 400, Instruction No. 5). Jurors were advised they could "consider only those aggravating circumstances set forth in these instructions." (Id. at 404, Instruction No. 9). Only after unanimously finding that one or more of the aggravating circumstances existed beyond a reasonable doubt could the jury even consider imposing a death sentence. Id. The jury is presumed to follow its instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)). Selsor's assumption that his jury considered the victim impact evidence to be another aggravating circumstance ignores the plain language of the instructions given at trial, which the jury is presumed to follow. Selsor's jury found the existence of two aggravating circumstances beyond a reasonable doubt before recommending the death sentence.  The victim impact evidence did not pose an additional aggravating circumstance for the jury's consideration.

Selsor also complains about the constitutionality of victim impact laws in Oklahoma. The Supreme Court has determined that aggravating circumstances give effect to constitutional protections by narrowing the class of death eligible murders, and the introduction of victim impact evidence does not eliminate that effect. Tuilaepa v. California, 512 U.S. 967, 979-80 (1994). "[T]he sentencer may be given unbridled discretion in determining whether the death penalty should be

56

imposed after it has found that the defendant is a member of the class made eligible for that penalty." Id. (internal quotations omitted). "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." Id. at 979. This Court finds that the use of victim impact evidence in general under Oklahoma law, and specifically in Selsor's trial, did not deprive Selsor of his Eighth Amendment or Fourteenth Amendment rights. The OCCA's decision on this issue in Selsor's direct appeal was not an unreasonable application of clearly established federal law as determined by the Supreme Court. Habeas relief is denied on this issue.

## VII.    Prosecutorial misconduct (Ground I)

In Ground I Selsor asserts that prosecutorial misconduct, including improper questions, comments, and argument to the jury, deprived him of his right to a fundamentally fair trial in violation of the Eighth and Fourteenth Amendments. Specifically, he complains of three instances of alleged misconduct when the prosecutor: (1) presented misleading evidence that Richard Dodson's first shot was only a warning shot; (2) demeaned Selsor's mitigation evidence; and (3) presented arguments contrasting the value of Selsor's life against that of the murder victim's life. The Court will also consider Selsor's claim that the prosecution's examination of Ina Morris was improper, as raised in Section H addressing victim impact evidence. Respondent maintains that these averments were raised and adjudicated on direct appeal where the OCCA determined that Selsor was not denied a fair trial or due process. The OCCA found none of the alleged instances of misconduct, either individually or collectively, warranted relief.  Selsor II, 2 P.3d at 353-54. Respondent urges that Selsor has not met his burden of proof on this issue and is not entitled to habeas relief under § 2254(d).

Five instances of alleged prosecutorial misconduct during both stages of trial were presented by Selsor on direct appeal to the OCCA. The state court found none of the alleged inflammatory comments made by the prosecutor were objected to by defense counsel and were, therefore, waived except for plain error. The OCCA found no plain error. Id. at 353.The Supreme Court has prescribed rules that govern Selsor's prosecutorial misconduct claims. Therefore, this Court must determine whether the OCCA's decision on these claims is contrary to such rules. 28 U.S.C. § 2254(d)(1).

Not every improper and unfair remark made by a prosecutor will amount to a federal constitutional deprivation. See Caldwell v. Mississippi, 472 U.S. 320, 338 (1985) (plurality opinion). When a prosecutor's comment or argument deprives a defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair. Mahorney v. Wallman, 917 F.2d 469, 472 (10th Cir. 1990) (citing Donnelly, 416 U.S. at 643). A prosecutor's improper comment or argument which does not deprive a defendant of a specific constitutional right will require the reversal of a state conviction only where those remarks sufficiently infect the trial so as to make it fundamentally unfair and, therefore, a denial of due process. Donnelly, 416 U.S. at 643, 645. See also Trice v. Ward, 196 F.3d 1151, 1167 (10th Cir. 1999); Hoxsie v. Kerby, 108 F.3d 1239, 1243 (10th Cir. 1997). Federal law clearly provides that in order to constitute a due process violation the prosecutorial conduct must be of sufficient significance to result in the denial of a defendant's right to a fair trial. Donnelly, 416 U.S. at 645.

This Court's inquiry into the fundamental fairness of a trial can only be made after examining the entire proceeding. Donnelly, 416 U.S. at 643. The complained of remarks or

58

arguments must be considered in the context in which they were made.  Greer v. Miller, 483 U.S. 756, 765-66 (1987); see also Darden v. Wainwright, 477 U.S. 168, 179 (1986). The Tenth Circuit directs that:

> To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly "could have tipped the scales in favor of the prosecution." . . . We also ascertain whether curative instructions by the trial judge, if given, might have mitigated the effect on the jury of the improper statements. . . . Ultimately, we "must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly."

Fero v. Kerby, 39 F.3d 1462, 1474 (10th Cir. 1994) (citations omitted).  In addition, the Court must consider the prejudice, if any, attributable to the prosecutor's comments.  Brecheen v. Reynolds, 41 F.3d 1343, 1355 (10th Cir. 1994) (citing Mahorney, 917 F.2d at 472-73).  This Court has examined the transcripts from the entire state court proceeding, and will apply the principles established by the Supreme Court to Selsor's individual instances of alleged  prosecutorial misconduct.

**A.      References to co-defendant Dodson's "warning shot"**

Selsor first claims that during the direct examination of co-defendant Richard Dodson and during second stage closing argument, the prosecutor was allowed to characterize Dodson's first shot at Ina Morris as a "warning shot." Selsor argues that this was misleading and gave the jurors a false impression that Selsor's culpability was greater than Dodson's. He states that nothing in Dodson's testimony supported a characterization that the first shot had been a warning shot. See Dkt. # 18 at 91. In denying relief on this issue, the OCCA found:

> Selsor first submits that the prosecutor's comment that the first shot (which was fired by Dodson) was only a warning was erroneous. To Selsor, this mislead the jury into believing that he was more culpable than Dodson. The record reveals that the comment was a reasonable inference from the evidence. The testimony indicates

that Dodson fired the first shot so that Morris could comply with his commands. Thus, Dodson's first shot could fairly be characterized in argument as a "warning."

Selsor II, 2 P.3d at 353-54. Selsor provides no legal authority or argument to support his conclusory statement that the OCCA'S "ruling was an unreasonable determination of the facts in light of the evidence, and an unreasonable application of clearly established Supreme Court precedent." See Dkt. # 18 at 92. Because Selsor does not argue the prosecutor's references to Dodson's first shot as a "warning shot" violated a specific constitutional right, this Court will analyze the claims under the fundamental fairness standard of Donnelly (examining the entire proceedings to determine if a prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process). Donnelly, 416 U.S. at 643.

The Court notes that Santa Barbara police investigator, John Evans, had interviewed Selsor upon his arrest in 1975, and testified as follows about Selsor's confession:

He told me that they entered the premise and that Mr. Dodson immediately went back to the rear area of that store where a woman was working behind a cooler area, a glass cooler window. And he, Mr. Selsor, approached the gentleman that was at the cash register and told him that it was a robbery, and had that gentleman filling up a bag -- a sack with cash from what Mr. Selsor said came from the register in the drawer and a safe.

He then told me there was a shot fired in the back of the store, which he later told me was a warning shot because, apparently, the woman that was back there wasn't listening to Mr. Dodson when she was told to get down.

Tr. Trans. Vol. IV at 802. After a careful review of the totality of the circumstances of the trial, the Court does not find the statements of the prosecutor so prejudiced the jury against Selsor as to deny him the fundamental fairness to which he is entitled under the Constitution. See Brecheen v. Reynolds, 41 F.3d 1343, 1356 (10th Cir. 1994); see also Donnelly, 416 U.S. at 643. The OCCA correctly rejected Selsor's prosecutorial misconduct claim on this issue by finding that the reference

60

to a "warning shot" was based on reasonable inferences to be drawn from the evidence, and was fair comment. Therefore, Selsor is not entitled to habeas corpus relief on this claim.

### B.      Comments on mitigation evidence

Selsor next argues that, during second stage closing argument,  the prosecutor demeaned mitigating evidence by claiming that the correctional officers who were witnesses were motivated by fear, and by ridiculing the evidence of rehabilitation which these witnesses sponsored. The OCCA adjudicated this claim on direct appeal, rejecting it as follows:

> Selsor also contends that the prosecutor demeaned his mitigation evidence by arguing facts outside the record. The prosecutor's arguments were fair challenges to Selsor's mitigating evidence. Moreover, the comments were not based upon facts outside the record but were reasonable inferences and arguments from the facts adduced at trial. There was no error.

Selsor II, 2 P.3d at 354. Respondent responds that the OCCA's adjudication was not an unreasonable application of Supreme Court law, nor was it an unreasonable determination of the facts.

Relying on Skipper v. South Carolina, 476 U.S. 1 (1986), and Caldwell v. Mississippi, 472 U.S. 320 (1985), Selsor urges this Court to find that the prosecutor's tactics rendered his sentencing trial fundamentally unfair in violation of his constitutional rights. His reliance on these cases, however, is misplaced. In Skipper, the trial judge ruled that the proffered testimony of two jailers and a "regular visitor" to the effect that the defendant had "made a good adjustment" during his incarceration prior to trial was irrelevant and inadmissible. Skipper, 476 U.S. at 1. The Supreme Court found that Skipper was denied his right to place before the sentencing jury all relevant evidence in mitigation of punishment. Id. (citing Lockett v. Ohio, 438 U.S. 586 (1978), and Eddings v. Oklahoma, 455 U.S. 104 (1982)).  Selsor was not denied his right to present the

61

testimony of the correctional officers.  The <u>Caldwell</u> decision also rested on a vastly different scenario. The prosecutor in <u>Caldwell</u> had impermissibly and inaccurately sought to minimize the jury's sense of the importance of its role by implying that the "responsibility for determining the appropriateness of the defendant's death rests elsewhere." <u>Caldwell</u>, 472 U.S. at 328-29. Condemning the argument offered by the prosecutor, the Supreme Court concluded the comments affected the fundamental fairness of the sentencing proceeding in violation of the Eighth Amendment. <u>Id.</u> at 340. The facts of Selsor's case are easily distinguished. Selsor's prosecutor did not mislead the jury about its sentencing obligations. His comments "bore on the weight to be accorded to the mitigating evidence." <u>See</u> <u>e.g.</u>, <u>Fox v. Ward</u>, 200 F.3d 1286, 1299-1300 (10th Cir. 2000). "As long as the jury is properly instructed on the use of mitigating evidence, the prosecution is free to comment on the weight the jury should accord to it." <u>Bland v. Sirmons</u>, 459 F.3d 999, 1026 (10th Cir. 2006) (citing <u>Fox</u>, 200 F.3d at 1299). The prosecutor did not mislead the jurors about their responsibilities or duties, nor did he suggest they should not consider the mitigating evidence. Accordingly, this Court concludes that the prosecutor's comments did not deny Selsor a fundamentally fair and reliable sentencing determination in violation of his constitutional rights. The OCCA's decision was not an unreasonable application of Supreme Court law, or based upon an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)(2). Thus, Selsor is not entitled to relief on this claim.

### C.       Comparing value of life

Selsor argues that during the second stage closing argument, the prosecutor asked jurors to weigh Selsor's life in prison against the victim's life. Specifically, Selsor objects to the prosecutor's

comparison of Selsor's life in prison with Clayton Chandler's death. This claim was raised on direct

appeal and rejected on the merits by the OCCA, which found:

> Selsor argues that the prosecutor improperly compared the advantages of Selsor's life in prison to the plight of the dead victim. These comments by the prosecutor are not error. Instead, they fairly commented on Selsor's mitigation evidence and merely asked the jury to consider what Selsor's life was like and would be like in prison based upon the evidence at trial in determining the appropriate punishment. This is proper argument.

Selsor II, 2 P.3d at 354. Respondent urges the Court to find that the OCCA's decision was not an

unreasonable application of Supreme Court law.

> At issue is the following portion of the prosecutor's closing argument to the jury:

> Ladies and gentlemen, I submit to you, based on the evidence you've heard in this case, you've got to decide the punishment in this case. Let's think about the punishment. If you vote for a verdict other than death, what is going to be Mike Selsor's punishment? What is he going to have? He's going to have freedom, freedom to do what he wants.

> What have you heard about over the last 23 years? This will be your punishment. He can do what he wants. He can smoke dope, he can hang out with his friends, he can read books, watch TV, write letters, participate in rodeos, workout, play ball, work in the garden. He doesn't have to have a job. You've heard he doesn't even hold a job. He sits around and does what he wants. And all of his needs are met: clothing, food, and shelter. Is that too good for what he's done? Is that the appropriate punishment in this case?

> . . . .

> But what has he done? What has been his reign of terror? Clayton Chandler lost his life, brutally, savagely, without mercy, without pity, without hesitation, without any concern for human life. He took Clayton Chandler from his family. His little girl did not get to see daddy come home that night. When she went into the door to put her arms around dad, there was no dad. He took a husband. Her dreams were in that man. Her dreams. He took the father, took a pillar of society. This was a good man. He didn't do anything to deserve to die like a dog in that store.

Tr. Trans. Vol. V at 1203-04. These comments were inappropriate, and the OCCA's finding that

they were proper is contrary to federal law as determined by the Supreme Court. See Gardner v.

<u>Florida</u>, 430 U.S. 349, 358 (1977) (finding "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."). Thus, the OCCA's decision is not afforded deference and this Court will review the issue *de novo.* <u>Trammell v. McKune</u>, 485 F.3d 546, 550 (10th Cir. 2007); <u>Cargle v. Mullin</u>, 317 F. 3d 1196, 1202 (10th Cir. 2003).

The Tenth Circuit has noted many times that "it is prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison." <u>Bland</u>, 459 F.3d at 1028 (citing <u>Duckett v. Mullin</u>, 306 F.3d 982, 992 (10th Cir. 2002); <u>Le v. Mullin</u>, 311 F.3d 1002, 1015-16(10th Cir. 2002)).  As in <u>Bland</u>, however, a finding that the prosecution's remarks were inappropriate is not sufficient to grant habeas corpus relief. The Court must determine whether the comments deprived Selsor of a fundamentally fair trial. <u>Bland</u>, 459 F.3d at 1028.  Because there was substantial evidence to support the existence of the aggravating factors, the Court cannot conclude that the prosecutor's comments negatively affected the outcome of the sentencing decision by the jury. Selsor is not entitled to habeas corpus relief on this issue.

### D.     Testimony of Ina Morris

In Ground H (victim impact section), Selsor complained of the prosecutor's examination of witness Ina Morris. <u>See</u> Dkt. # 18 at 85-6. As a shooting victim of the U-TOTE-M robbery, Morris testified on behalf of the State in the guilt stage about the events of September 15, 1975 (Tr. Trans. Vol. IV at 864-81).  She was called again by the State during second stage punishment proceedings to testify about her recovery from the gunshot wounds she suffered during the robbery, and the impact on her life since the September 15, 1975 robbery and shooting (Tr. Trans. Vol. V at 1046-56).  Selsor contends that Morris's second stage testimony violated his constitutional right

to a fair trial, as did the prosecutor's reference to her testimony during second stage closing argument. Regarding Selsor's objection to Morris's second stage testimony, the OCCA found:

> Selsor argues that Ina Morris's testimony was inadmissible as victim impact evidence because she was not a "family member" of the victim. Indeed, portions of Morris's testimony were inadmissible for this reason, such as the psychological and emotional impact the shooting had upon Morris's life. However, most of her testimony was admissible to support the "knowingly created a great risk of death to more than one person" aggravating circumstance, as disclosed by the State in its notice of evidence in aggravation. Morris's testimony concerning being shot and the medical attention she received for her injuries was clearly relevant to the "great risk of death to more than one person" aggravating circumstance.

Selsor II, 2 P.3d at 352 (citations and footnotes omitted). Because Selsor did not timely object to the admissibility of Morris's testimony, the OCCA reviewed for plain error, and found none. Id. The state appellate court concluded that "[t]he inadmissible portions of Morris's testimony did not go to the foundation of Selsor's case or take from him a substantial right." Id. at 352.

Regarding the alleged improper second stage closing argument in which the prosecutor sympathized with Ina Morris's difficulties, the OCCA found:

> The brief argument about which Selsor complains does focus somewhat on the inadmissible portions of Morris's testimony. However, the prosecutor cannot be condemned for arguing evidence as admitted at trial. Moreover, as found in Proposition IX, this evidence did not deny Selsor a fair trial or contribute to the jury's sentencing decision. The same can be said for the prosecutor's argument concerning this evidence.

Selsor II, 2 P.3d at 354.

Respondent submits that Selsor has failed to demonstrate that the OCCA's rejection of this claim was an unreasonable application of Payne. Insofar as Ina Morris's testimony can be characterized as victim impact testimony, the Court agrees. To the extent Selsor intends to argue that the admission of her testimony as "victim impact testimony" was a violation of Oklahoma's victim impact laws, the claim is not reviewable in this federal habeas corpus proceeding. Habeas

review is not available to correct state law evidentiary errors. <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1275 (10th Cir. 1999) (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) (habeas review is limited to violations of constitutional rights)).  Finally, in light of the <u>Donnelly</u> standards, the Court finds that the prosecutor's use of Morris's testimony in his second stage closing argument did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly</u>, 416 U.S. at 643. Selsor has not demonstrated that the OCCA's resolution of the issues relating to Ina Morris's testimony was an unreasonable application of Supreme Court law, or an unreasonable determination of the facts in light of the evidence presented at trial. 28 U.S.C. § 2254(d). Habeas relief is denied on this claim.

## VIII.   Voir dire (Ground J)

In his next ground, Selsor attacks the constitutionality of the trial court's *voir dire* process Specifically, he asserts that the trial court erred in denying Selsor's request for individual *voir dire* during jury selection.  This claim was presented to, and rejected by, the OCCA. Respondent contends that the decision of the OCCA was a reasonable application of clearly established federal law as determined by the Supreme Court.

In considering Selsor's objection to the trial court's refusal to grant individual *voir dire* of prospective jurors, the OCCA stated:

> Selsor specifically complains that he was prejudiced by the denial of individual *voir dire* after four members of the panel, purportedly educated by previous venire persons on how to avoid jury service, were successful in being excused. Upon learning what was occurring, the trial court admonished prospective jurors to answer questions honestly, because based upon past experience jurors may have answered questions untruthfully to avoid jury service. To Selsor, these facts establish that "one cannot be confident that the jury was picked fairly."
>
> Selsor's argument is speculative. He has not established that the trial court abused its discretion or that he was prejudiced. The jury was selected fairly. Selsor's

attorneys extensively questioned the prospective jurors. Selsor was presumably satisfied with the selection process because he did not renew his request for individual *voir dire* or exercise all of his peremptory challenges at trial. This proposition is denied.

Selsor II, 2 P.2d at 348. In affirming the denial of habeas relief on a nearly identical claim, the

Tenth Circuit Court of Appeals has determined that:

> [A] defendant's right to an impartial jury includes the right to an adequate voir dire to identify unqualified jurors. See Morgan v. Illinois, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). There is no absolute constitutional right to individual voir dire in capital cases, Trujillo v. Sullivan, 815 F.2d 597, 606-07 (10th Cir. 1987); McCorquodale v. Balkcom, 721 F.2d 1493, 1496 (11th Cir. 1983) (en banc), but the method of voir dire must comport with due process requirements, Trujillo, 815 F.2d at 607. "An exercise of discretion to deny sequestered voir dire ... may comport quite easily with due process under the specific circumstances, whereas that same exercise of discretion may offend notions of fairness" in another setting. Id. "There may be a case where en masse death-qualifying voir dire may be so egregious and may so taint the jury that the process denies the defendant his constitutional right to an impartial jury." Id. We might be concerned, for example, if a juror stated in front of other venire members that he was aware that the defendant had been arrested in another state for some heinous crime; Byrd v. Armontrout, 880 F.2d 1, 11 (8th Cir. 1989) (finding, however, that this questioning was harmless error); or if a juror expressed his opinion on guilt or innocence, formed because of pre-trial publicity, thereby tainting the entire venire, United States v. Tegzes, 715 F.2d 505, 508 (11th Cir. 1983) (same).

Wilson v. Sirmons, 536 F.3d 1064, 1098 (10th Cir. 2008), *reinstated en banc*, 577 F.3d 1284 (10th

Cir. 2009).

In this case Selsor has failed to show that his *voir dire* was so "egregious" that it violated

his due process rights.  Trujillo, 815 F.2d at 607. Nor has he shown any evidence of prejudice

resulting from the *voir dire* process. Based upon a review of the proceedings, this Court finds the

*voir dire* was adequate to determine whether prospective jurors were qualified to serve. See Moore

v. Gibson, 195 F.3d 1152, 1170 (10th Cir. 1999). The *voir dire* process implemented by the trial

court in this case did not deny Selsor his right to a fair and impartial jury, and the trial court's

exercise of its discretion to disallow individual *voir dire* did not render Selsor's trial fundamentally

unfair. <u>Morgan</u>, 504 U.S. at 730 n.5. Accordingly, this Court concludes the OCCA's determination

was not contrary to or an unreasonable application of Supreme Court precedent. Selsor is not

entitled to habeas relief under 28 U.S.C. § 2254(d).

**IX.      Ineffective assistance of counsel (Ground K)**

In his next claim for habeas corpus relief, Selsor contends that he received ineffective

assistance of both trial and appellate counsel. <u>See</u> Dkt. # 18 at 98-99. His entire argument consists

of the following three sentences:

> Each of the claims addressed in this brief has been considered and rejected on the
> merits by Oklahoma's Court of Criminal Appeals. Should the Court find otherwise,
> however, then any failure to raise these claims in the Oklahoma courts was due to
> ineffective assistance of trial and/or appellate counsel, in violation of the Sixth and
> Fourteenth Amendments. Given the substantive merit of each of the claims, any
> such default by counsel was both professionally unreasonable, and prejudicial to the
> Petitioner. See <u>Strickland v. Washington</u>, 466 U.S. 668, 688-89 (1984).

<u>Id.</u>  To the extent Selsor is arguing that ineffective assistance of appellate counsel should serve as

cause to excuse a procedural default for failing to raise other alleged meritorious issues on direct

appeal, his claim fails because the OCCA did not find that Selsor had procedurally defaulted any

of his claims. <u>See</u> Order Denying Application for Post-Conviction Relief in OCCA Case No. PC-

2000-87. Nor has this Court denied any ineffective assistance of counsel claims based on an

anticipatory procedural bar.

Selsor makes no argument to support his conclusory statement that any failure to raise

omitted issues was due to ineffective assistance of either trial or appellate counsel. The Court notes

that Selsor raised ineffective assistance of counsel claims in both his direct appeal and post-

conviction proceedings in state court. However, his lack of specificity in briefing the issue in this

habeas proceeding provides no basis for this Court to analyze whether the state courts reasonably applied Supreme Court law in resolving the claims. He has failed to frame and develop his ineffective assistance claims sufficiently to invoke this Court's habeas review. The Court will not speculate as to the specific instances of ineffective assistance which Selsor is referencing, and will not craft his legal theories for him. His general undeveloped claim of ineffective assistance of both trial and appellate counsel  is insufficient to convince this Court that a constitutional violation occurred.  Accordingly, habeas relief shall be denied on Ground K.

**X.      Claims listed in petition (Dkt. # 17), but not addressed in brief (Dkt. # 18)**

As summarized near the beginning of this Order, Selsor listed eighteen (18) grounds for habeas corpus relief in the petition filed on May 20, 2002 (Dkt. # 17). He then filed a separate brief in support of his petition, identifying and briefing ten (10) grounds (Dkt. # 18). Some of the grounds listed in Selsor's petition were combined into the arguments set forth in his supporting brief. However, portions of the original eighteen grounds are not mentioned at all in the supporting brief. Selsor acknowledges in his reply (Dkt. # 32) that he did not brief each of the issues raised in the petition, but asserts they are valid claims requiring a decision from this Court. A review of Selsor's state court proceedings reveals that all of the claims omitted from the brief were raised on direct appeal or in Selsor's application for post-conviction relief. Accordingly, the Court will rely, where necessary, on the arguments made by Selsor in state court proceedings.

**A.** **Great risk of death aggravator was not supported by the evidence and is unconstitutionally vague and overbroad (Ground 10[19])**

In Proposition X of his direct appeal brief, Selsor questioned the sufficiency of the evidence presented at trial to support the "knowingly created a great risk of death to more than one person" aggravating circumstance. He also argued that this aggravating circumstance is unconstitutionally vague because it does not properly narrow the jury's sentencing decision. The OCCA rejected both arguments and denied relief, as follows:

> This aggravating circumstance has been found constitutional as defined and applied, and Selsor offers no new arguments for reconsidering that conclusion. Selsor continues by arguing that even if constitutionally valid, the evidence was insufficient to prove beyond a reasonable doubt the applicability of this aggravating circumstance to his case.

> This Court views the evidence supporting an aggravating circumstance in a light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support it beyond a reasonable doubt. This Court reviews the record to determine if a defendant created a great risk of death to another in close proximity, in time and intent, to the murder. Under these standards, the evidence here was sufficient.

> Selsor and Dodson agreed before entering the store to leave "no witnesses." Store employees Chandler and Morris were the only people present at the time of the robbery. Upon completing the robbery, Selsor shot and killed Chandler, and Dodson repeatedly shot Morris. Morris was undoubtedly at risk of death in terms of time, intent and location to Chandler's murder.

Selsor II, 2 P.3d at 353 (footnotes containing citations omitted).

In reviewing a claim of insufficient evidence, this Court must first ask "whether, viewing the evidence in a light most favorable to the State, there was sufficient evidence for any rational fact finder to find this aggravating factor beyond a reasonable doubt." Romano v. Gibson, 278 F.

---

[19]    The grounds in this portion of the Order refer to the numbered grounds set forth in Selsor's petition (Dkt. # 17).

3d 1145, 1154 (10th Cir. 2002); LaFevers v. Gibson, 182 F. 3d 705, 723 (10th Cir. 1999) (applying

Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  In applying the Jackson standard, the Court looks

to Oklahoma law to determine the "substantive elements" of the "great risk of death to more than

one person" aggravator.  The OCCA has consistently interpreted the "great risk of death to more

than one person" aggravating circumstance in two ways.  The state court has held that more than

one person need not be killed, only that the defendant knowingly creates a great risk of death to

more than one person.  Accord Trice v. Ward, 196 F.3d 1151 (10th Cir. 1999) (holding that

evidence supported the jury's finding of the great risk of death to more than one person aggravator,

where the petitioner murdered one victim and delivered life threatening blows to a second victim).

 In addition, the OCCA has held the fact that more than one person is killed will satisfy this

aggravator.  Slaughter v. State, 950 P.2d 839, 858 n.10 (Okla. Crim. App. 1997) (citing Hain v.

State, 919 P.2d 1130, 1147 (Okla.Crim.App. 1996); Cargle v. State, 909 P.2d 806, 832

(Okla.Crim.App. 1995);  Hooker v. State, 887 P.2d 1351, 1364 (Okla.Crim.App. 1994);  Stafford

v. State, 853 P.2d 223, 225 (Okl.Cr.1993); Sellers v. State, 809 P.2d 676, 691 (Okla.Crim.App.

1991)).

        In the present matter, Selsor shot and killed one victim, and another victim in the store was

shot and wounded by co-defendant Dodson.  Such facts are more than sufficient to support the

jury's finding of the aggravating circumstance of "great risk of death." The OCCA found sufficient

evidence to support the jury's decision, and its decision was not an unreasonable application of the

Jackson standard.  Habeas relief is denied on this issue.

        Further, the Tenth Circuit has explicitly held that Oklahoma's aggravating circumstance of

"great risk of death to more than one person" is not unconstitutionally vague or overbroad.

Brecheen v. Reynolds, 41 F.3d 1343, 1360-61 (10th Cir. 1994); see also Ross v. Ward, 165 F.3d 793, 800 (10th Cir. 1999). In Brecheen, the Tenth Circuit found the construction of the circumstance provided consistent guidance to the jury so as to limit its discretion, because the circumstance "cannot reasonably be said to apply to every defendant convicted of murder." Id. at 1360; see also Arave v. Creech, 507 U.S. 463 (1993) (holding that to satisfy the Eighth and Fourteenth Amendments, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty). Concerning claims of vagueness, the Supreme Court has stated that its review is "quite deferential" as "'the proper degree of definition' of eligibility and selection of facts often 'is not susceptible of mathematical precision.'" Tuilaepa v. California, 512 U.S. 967 (1994) (citations omitted). The Supreme Court further noted that "a factor is not unconstitutional if it has some 'common sense core of meaning . . . that criminal juries should be capable of understanding.'" Id. (quoting Jurek v. Texas, 428 U.S. 262, 279 (1976) (White, J., concurring)). In Brecheen, the Tenth Circuit stated that the language of the "great risk of death" aggravator has a "common sense core of meaning" that juries can understand.   Brecheen, 41 F.3d at 1361. Consequently, the Tenth Circuit found the statutory language of the circumstance to be clear and objective, and held that the "great risk of death to more than one person" aggravating circumstance is not unconstitutionally vague. Id. This Court, accordingly, holds the "great risk to more than one person" aggravator, as used by the Oklahoma courts, is not unconstitutional for vagueness or because of overbroad application.

The OCCA's resolution of Selsor's challenges to the "great risk of death" aggravator was not an unreasonable application of clearly established Supreme Court law or an unreasonable determination of the facts in light of the evidence presented. 29 U.S.C. § 2254(d)(1)(2).

72

**B.      Continuing threat aggravator was not supported by the evidence (Ground 11)**

In this ground Selsor argues that he was denied due process of law, a fair jury trial and a reliable capital sentencing determination because the prosecution presented inadmissible and prejudicial evidence to support the continuing threat aggravating circumstance, including uncorroborated confessions as to other robberies, and evidence relating to the stabbing of Neomah Wilson[20] by Richard Dodson. The jury did not find the existence of the "continuing threat" aggravator. However, in his direct appeal brief Selsor urges that the improper evidence affected the jury's finding that the aggravation outweighed the mitigation. The OCCA found:

> In Proposition XI, Selsor argues that the use of inadmissible and prejudicial evidence to support the "continuing threat" aggravating circumstance improperly contributed to his death verdict even though the jury did not find this aggravating circumstance to exist. Selsor's argument fails. Assuming, as Selsor argues, that his confession to the two uncorroborated robberies was inadmissible and that the evidence concerning the Wilson robbery was cumulative and unnecessarily prejudicial, it did not contribute to his death verdict.
>
> Selsor's jury found two aggravating circumstance: i, that Selsor knowingly created a great risk of death to more than one person; and ii, that the murder was committed for the purpose of avoiding or preventing a lawful arrest. The record establishes that both of these aggravating circumstances were proven by the facts of this murder and robbery and not any of the evidence complained of by Selsor. Accordingly, we conclude beyond a reasonable doubt that the jury's death verdict was not affected by the admission of the evidence supporting the continuing threat aggravating circumstance.

Selsor II, 2 P.3d at 353 (footnotes omitted). Selsor's claim that the "uncorroborated" testimony affected the jury's findings in the second stage is based on conjecture.

---

[20]      During second stage proceedings, the State called Neomah Wilson to testify about a robbery at a different U-TOTE-M store. Ms. Wilson testified that she was working at the store on September 6, 1975, when two men entered the store and robbed her at knifepoint. She was stabbed during the incident. Tr. Trans. Vol. V at 1004-1010. Police officer Evans testified during the second stage that Selsor admitted participation in the robbery in which Wilson was stabbed by Dodson. Tr. Trans. Vol. IV at 940.

Selsor has not demonstrated that the OCCA's decision was an unreasonable application of federal law as established by the Supreme Court, or that it was based on an unreasonable determination of the facts.  Habeas relief shall be denied on this ground.

### C.       Ineffective assistance of prior habeas corpus counsel (Ground 13)

Selsor next complains he was denied his constitutional right to the effective assistance of counsel because counsel appointed to represent him in his first federal habeas proceedings failed to advise him of the risks in the event he was granted a new trial. This claim must fail, as there is no constitutional right to counsel in a federal habeas corpus proceeding. The Sixth Amendment right to counsel does not apply to civil proceedings such as habeas corpus in which a petitioner is collaterally attacking his conviction. Chaney v. McCotter, 5 F.3d 545 (10th Cir. 1993) (citing Coleman, 501 U.S. at 752-53). Where there is no constitutional right to counsel there can be no deprivation of effective assistance. Wainwright v. Torna, 455 U.S. 586 (1982). "In the absence of a constitutional violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation . . . ." Coleman, 501 U.S. at 754. Relief is denied on Selsor's ineffective assistance of habeas counsel claim.

### D.       Evidentiary ruling regarding testimony of witness Bervin Knott (Ground 14)

Selsor next claims he was denied his fundamental right to present a defense because the trial court sustained the State's objection to questioning of Bervin Knott about the veracity and character for truthfulness of witness Richard Dodson. This claim was raised as Proposition II in his application for post-conviction relief. The OCCA denied relief.

During second stage proceedings, Bervin Knott, a State of Oklahoma prison employee, was called by the defense to testify about Selsor's character and good behavior in prison. See Tr. Trans.

74

Vol. V at 1108-118.  After eliciting answers to several questions about Selsor, defense counsel then asked, "Can you tell me a little bit about Mr. Richard Dodson?" Id. at 1115. The prosecutor objected and the Court sustained the objection because questions about Dodson were not relevant to mitigation evidence for Selsor. Id. at 1115-116.

To the extent Selsor contends that the trial judge made an  erroneous evidentiary ruling, he is not entitled to federal habeas corpus relief.  See Estelle v. McGuire, 502 U.S. 62 (1991) (federal habeas court can review only for federal constitutional, statutory, or treaty errors). As a general rule, "[f]ederal habeas review is not available to correct state law evidentiary errors." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999). Selsor has not demonstrated that his constitutional rights were violated when the trial judge ruled that testimony concerning Dodson's character was not relevant to Selsor's mitigation case. Habeas relief shall be denied on this issue.

E.      Cruel and unusual punishment (Ground 15)

Selsor asserts in this ground that to execute him now, for a crime committed in 1975, would be cruel and unusual punishment in violation of the Eighth Amendment. This claim was raised as Proposition IV in his state application for post-conviction relief, together with an assertion that his appellate counsel was ineffective for failing to raise the claim on direct appeal. The OCCA only discussed the ineffective assistance of counsel claim, denying relief.

In his application for post-conviction relief, Selsor relies on language from Lackey v. Texas, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of certiorari), and Elledge v. Florida, 525 U.S. 944 (1998)(Breyer, J., dissenting from denial of certiorari), to argue that the delay in his execution constitutes cruel and unusual punishment. Although both cases contain language acknowledging the seriousness of lengthy delays before executions are carried out, neither specifically finds that

75

an unusually long delay constitutes cruel and unusual punishment. See also Foster v. Florida, 537 U.S. 990 (2002) (Breyer, J., dissenting from denial of certiorari); Smith v. Arizona, 128 S.Ct. 2007 (1997) (Breyer, J., dissenting from denial of certiorari). Further, it is important to note that Selsor has not been on death row awaiting execution the entire period of his incarceration. Although he was originally sentenced to death by his first jury, the OCCA modified the sentence to life imprisonment in 1977. He did not receive his current death sentence from the second jury until 1998. This Court agrees that the issue of whether it is cruel and unusual to hold an individual for decades on death row raises a serious constitutional question. However, the Court is not convinced that Selsor has spent an unconstitutionally long period of time on death row, and absent Supreme Court law supporting Selsor's claim, this Court shall deny habeas relief on Ground 15.

> **F.     Ineffective assistance of appellate counsel for failing to contend charge should have been reduced to murder in the second degree (part of Ground 18)**

In Proposition III of his application for post-conviction relief, Selsor argued that his appellate counsel was constitutionally ineffective because she failed to raise the issue that the conviction must be reduced to murder in the second degree. The OCCA denied relief, applying the three-prong test enunciated in Walker v. State, 933 P.2d 327 (Okla. Crim. App. 1997). That legal test deviates from the controlling federal standard.  See Cargle v. Mullin, 317 F.3d 1196, 1202-05 (10th Cir. 2003).  As a result, the OCCA's analysis of Selsor's claim of ineffective assistance of appellate counsel is not entitled to deference on federal habeas corpus review. Id. at 1205; Malicoat v. Mullin, 426 F.3d 1241, 1248 (10th Cir. 2005). Therefore, this Court will conduct a *de novo* review of Selsor's claim that his appellate counsel was constitutionally ineffective for failing to argue that his conviction must be reduced to second degree murder.

In evaluating a claim of ineffective assistance of appellate counsel, this Court applies the Strickland two-pronged standard used for claims of ineffective assistance of trial counsel. See United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995). To establish ineffective assistance of counsel a petitioner must show that his counsel's performance was deficient and that the deficient performance was prejudicial. Strickland, 466 U.S. at 687; Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993). A petitioner can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases. Strickland, 466 U.S. at 687-88. There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." Id. at 688. In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. Moreover, review of counsel's performance must be highly deferential. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. To establish the second prong, a defendant must show that this deficient performance prejudiced the defense, to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Sallahdin v. Gibson, 275 F.3d 1211, 1235 (10th Cir. 2002); Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999).

When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, the Court first examines the merits of the omitted issue. Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999). If the omitted issue is meritless, then

counsel's failure to raise it does not amount to constitutionally ineffective assistance.  Id.; see also

Parker v. Champion, 148 F.3d 1219, 1221 (10th Cir. 1998) (citing Cook, 45 F.3d at 392-93). If the

issue has merit, the Court then must determine whether counsel's failure to raise the claim on direct

appeal was deficient and prejudicial.  Hawkins, 185 F.3d at 1152; see also Cook, 45 F.3d at 394.

More particularly, "the relevant questions are whether appellate counsel was 'objectively

unreasonable' in failing to raise these . . . claims on direct appeal and, if so, whether there is a

'reasonable probability that, but for his counsel's unreasonable failure' to raise these claims,

[Petitioner] 'would have prevailed on his appeal.'" Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir.

2001).

In Proposition III of his application for post-conviction relief, Selsor argued that the

instructions presented to the jury were actually instructions for second degree murder because they

were not required to find the element that the murder was committed while in the commission of

an armed robbery.  Thus, his appellate counsel was ineffective for failing to challenge the first

degree murder conviction on the grounds that it should have been changed by the OCCA to second

degree murder.  According to Selsor, he should have been charged with a violation of the following

1973 Oklahoma statute:

> 701.2 Murder in the second degree -- Homicide is murder in the second degree in
> the following cases:
> 1. When perpetrated without authority of law, and with a premeditated design to
> effect the death of a person, or of any other human being, but by an act not
> enumerated in the preceding section [first degree murder section];
> 2. When perpetrated by an act imminently dangerous to others and evincing a
> depraved mind, regardless of human life, although without any premeditated design
> to effect the death of any particular individual; or
> 3. When perpetrated without any design to effect the death by a person engaged in
> the commission of any felony other than the felonious acts set out in Section 1 of
> this act.

See Application for Post-Conviction Relief in OCCA Case No. PC-2000-87 at 22. The Court notes that Selsor does not argue that his appellate counsel was ineffective for failing to raise a claim that his trial counsel was ineffective. He states that his appellate counsel should have recognized that the conviction and sentence were wrong and requested a modification in direct appeal proceedings. This assertion lacks merit. First, the Court is not convinced that any evidence was introduced at trial to support a second degree murder conviction. In Oklahoma, instructions on lesser forms of homicide should be administered only if they are supported by the evidence. Shrum v. State, 991 P.2d 1032, 1036. (Okla. Crim App. 1999). More importantly, even if appellate counsel had raised the claim on direct appeal, Selsor has failed to demonstrate that there is a reasonable probability that the OCCA would have modified his conviction and sentence, reducing his first degree murder conviction to second degree murder. The OCCA determined that the jury instructions for first degree murder were adequate under Oklahoma law. Selsor has not met his burden of proof under Strickland to demonstrate that appellate counsel's representation was deficient, or that such alleged deficiency was prejudicial. Selsor is not entitled to relief on this claim.

## CONCLUSION

After careful review of the record in this case, the Court concludes that Michael Selsor has not established that he is in custody in violation of the Constitution or laws or treaties of the United States.  His petition for writ of habeas corpus shall be denied.

**ACCORDINGLY IT IS HEREBY ORDERED THAT**:

1.     Randall G. Workman is substituted for Mike Mullin as the party Respondent and the **Court Clerk is directed** to note such substitution on the record.

2.     Selsor's petition for habeas relief (Dkt. # 17) is **denied**.

3.      A separate judgment shall be entered in this matter.

**DATED** this 29th day of September, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT