**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

MICHAEL SELSOR,                          )
                                         )
                    Petitioner,          )
                                         )
          vs.                            )     **Case No. 01-cv-721-CVE-TLW**
                                         )
ANITA TRAMMELL, Warden,                  )
Oklahoma State Penitentiary,[1]          )
                                         )
                    Respondent.          )

## REPORT AND RECOMMENDATION

Before the undersigned for a report and recommendation are three Criminal Justice Act

(CJA) 30 vouchers from appointed counsel Gary Peterson and Robert A. Nance. The vouchers

seek payment in the amount of $37,855.70 for services performed in representing petitioner

Michael Selsor in his state clemency proceedings.[2] As set forth below, the undersigned

recommends that counsel should receive a partial payment in the amount of $16,979.64.

## BACKGROUND INFORMATION

Pursuant to the then-existing CJA Guidelines, the Tenth Circuit Court of Appeals

approved a preliminary budget and interim payments for Attorney Peterson in petitioner's state

clemency proceedings. (Dkt. # 70). When the CJA Guidelines were amended in May 2011, the

Tenth Circuit Court of Appeals transferred administration of the CJA vouchers to the District

Court. Id. Because the Tenth Circuit Court of Appeals had already given preliminary

authorization for some expenditures associated with the clemency proceedings, it retained

---

[1] On February 28, 2013, Anita Trammell was appointed Warden of the Oklahoma State
Penitentiary. Pursuant to Fed. R. Civ. P. 25(d)(1), Anita Trammell is substituted as the
respondent in this action.

[2] The Oklahoma Pardon and Parole Board denied petitioner's claim for clemency, and petitioner
was executed by the State of Oklahoma on May 1, 2012. See http://newsok.com/okla.-death-row-
inmate-executed-in-shooting-death/article/feed/377440 (last visited on October 24, 2013).

jurisdiction over any vouchers submitted through July 29, 2011. (Dkt. # 70). The Tenth Circuit noted, however, that the District Court had authority to make its own determination about the reasonableness of any vouchers submitted after that date and also had authority to conduct a new budget conference. Id. The Tenth Circuit Court of Appeals eventually approved $9,247.91 in expenses associated with the state clemency proceeding. (Dkt. # 79).

On September 27, 2011, Attorney Peterson requested appointment of a second attorney to assist in the clemency proceedings. (Dkt. # 73). The District Court approved appointment of Robert A. Nance as co-counsel. (Dkt. # 76). The District Court also ordered counsel to "submit a joint ex parte proposed budget for representation of Selsor in his clemency proceedings." Id.

Attorneys Peterson and Nance submitted a proposed budget of $51,022.42. (Dkt. # 79). This sum did not include the $9,247.91 already paid through the Tenth Circuit. Id. The proposed budget included an explanation of how the time would be spent, including the creation of a video that would include testimonials from people who could comment on petitioner's positive impact on the prison community. Id.

The undersigned held a telephone conference with Attorney Peterson and advised him that the proposed budget was excessive for a clemency proceeding and that prior clemency proceeding budgets had generally not exceeded $10,000.00. (Dkt. # 81). The magistrate judge ordered Attorney Peterson to submit a revised budget. Id. The revised proposed budget requested $36,047.42 for the clemency proceeding. (Dkt. # 82).

On February 29, 2012, the undersigned issued an order setting the approved clemency budget in an amount not to exceed $12,000.00. (Dkt. # 84). Nonetheless, the CJA vouchers submitted for payment totaled $37,855.70. In addition to the vouchers and time sheets, Attorney Peterson submitted a memorandum explaining the time incurred and the strategy adopted for the

clemency hearing. The memorandum contained a link to the clemency packet, which the undersigned has reviewed.[3]

**Procedural History**

As the District Court noted in its Opinion on petitioner's petition for writ of habeas corpus, the procedural history of petitioner's case was highly unusual. (Dkt. # 53). Petitioner and a co-defendant, Richard Dodson ("Dodson"), robbed a convenience store in September 1975. See Selsor v. Oklahoma, 2 P.3d 344, 347-48 (Okla. Crim. App. 2000). During the course of the robbery, petitioner shot and killed the clerk. See id. Dodson shot a second clerk several times, but she survived. See id. In a confession, petitioner "admitted that before entering the store, he and Dodson had agreed to leave no witnesses." Id. at 348. Petitioner and Dodson were both charged with first degree murder, shooting with intent to kill, and robbery with firearms. (Dkt. # 53). The cases were consolidated. Id. The jury convicted petitioner on all three crimes and recommended the death sentence for the murder charge. Id. Dodson, however, was convicted only on the robbery and shooting with intent to kill charges. Id.

On his initial appeal, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed the convictions but ruled that petitioner's death sentence should be modified to life imprisonment. See Selsor v. State, 562 P.2d 926 (Okla. Crim. App. 1977). The OCCA agreed with petitioner that Oklahoma's death penalty statute was unconstitutional. See id. at 927 (citing Riggs v.

---

[3] The video that was played for the Pardon and Parole Board was not available for review, but a summary of the video, naming those who were interviewed, was included in the clemency packet.

Branch,[4] 554 P.2d 823 (Okla. Crim. App. 1976), overruled by Selsor v. Turnbull, 947 P.2d 579 (Okla. Crim. App. 1997)).

Following the modification of his sentence, petitioner continued to exercise his right to appeal by filing two applications for post-conviction relief in state court, one in 1978 and a second in 1989. (Dkt. # 53). Those applications were denied in the state district court and on appeal to the OCCA. Id. In 1991, petitioner filed a petition for federal habeas corpus relief. Id. Eventually, petitioner was successful on his claim of ineffective assistance of counsel, and the Tenth Circuit held that petitioner's "convictions are constitutionally invalid and cannot stand." Selsor v. Kaiser, 81 F.3d 1492, 1506 (10th Cir. 1996). See also Selsor v. Kaiser, 22 F.3d 1029 (10th Cir. 1994) (remanding petitioner's case to the District Court to hold a hearing on the issue of ineffective assistance of counsel). The Tenth Circuit also held, however, that the judgment invalidating the convictions was "without prejudice to further proceedings by the state for retrial of the petitioner within a reasonable time." Id.

The State of Oklahoma did pursue a new trial against petitioner, this time seeking the death penalty under Oklahoma's new first degree murder statute. (Dkt. # 53). Petitioner challenged the application of the death penalty to his crime, which occurred in 1975 when the old, unconstitutional statute was in effect. See Selsor v. Turnbull, 947 P.2d at 581. The OCCA held that, because petitioner's conviction was vacated, "he stands before this Court, similarly

---

[4] In Riggs, the OCCA determined that the United States Supreme Court "has essentially held that [Oklahoma's first degree murder statute] in reference to the death penalty is unconstitutional." Riggs, 554 P.2d at 827. The OCCA concluded that the death penalty sentence contained in the first degree murder statute "has been effectively stricken from our statute, which is now repealed." Id. However, the remaining provisions of the statute remained in effect, including an "alternative sentence" of life imprisonment. Id. at 829. The OCCA also held that it retained the power to modify the death sentence of those convicted of first degree murder to life imprisonment. See id. (overruling in part Williams v. State, 542 P.2d 554 (Okla. Crim. App. 1975)).

4

situated to defendants awaiting trial under current murder and death penalty statutes;" therefore, the State could pursue the death penalty under the current first degree murder statute. Id. at 583 (citing Dobbert v. Florida, 432 U.S. 282, 301, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) and Cheatham v. State, 900 P.2d 414, 428-30 (Okla. Crim. App. 1995)).

Petitioner was convicted again of first degree murder.[5] (Dkt. # 53). The jury also found two aggravating circumstances and recommended that petitioner receive the death penalty. Id. The trial court accepted the jury's recommendation and sentenced petitioner to death on the murder conviction. Id.

Petitioner's direct appeal, state post-conviction appeals, and federal habeas petition all focused on the application of the current first degree murder statute, which included the possibility of the death penalty, rather than the first degree murder statute in effect at the time of the crime, when life imprisonment was the only possible sentence. Id. Those appeals were not successful, id., so Petitioner sought clemency before Oklahoma's Pardon and Parole Board.

**Clemency Strategy**

In the clemency packet presented to the Pardon and Parole Board, petitioner's attorneys listed four reasons that clemency should be granted: (1) petitioner had already served more than thirty-six years, which counsel described as "the lion's share of a life sentence;" (2) the death penalty would unfairly punish petitioner for pursuing his constitutional right to appeal his conviction because petitioner had no reason to believe that he was "swapp[ing] a life sentence for a death sentence" until the state court created "an unexpected change in the law;" (3)

---

[5] Petitioner was also found guilty of shooting with intent to kill and robbery with firearms, but those convictions and their disposition on appeal are not relevant to this Report and Recommendation. (Dkt. # 53).

petitioner was a positive role model within the prison community; and (4) letters of support from petitioner's family and former attorneys justified a vote for clemency.

To support these arguments, the packet contained a number of exhibits. Among them was a list of sentencing outcomes for defendants who were originally sentenced to death between 1973 and 1976. This chart demonstrated that petitioner was the only defendant, of this group, who was currently facing the death penalty. Four of the thirty-eight defendants were on parole, and another four had been discharged from prison for other reasons. The packet also included trial testimony from former corrections officers who spoke to petitioner's good behavior during his time in prison. Other corrections officers offered support for clemency through the use of a video compiled by counsel. Additional exhibits included petitioner's Army records, information regarding the procedural history of his case, and information on his co-defendant, who had a long, violent criminal history.

In the memorandum attached to the CJA vouchers, counsel argued that the time incurred beyond the approved budget amount was justified. Counsel explained that the investigator had videotaped "several former correctional officers, former death row inmates, and the parents of a former death row inmate," all of whom stated that petitioner had been a positive influence and all of whom advocated for clemency. Those recordings were included in the clemency packet but were further edited for use during petitioner's presentation at the clemency hearing.

The investigator also solicited the letters of support. Obtaining letters from petitioner's ex-wife and son was difficult because both family members struggle with addiction. To ensure receipt of the letters, the investigator drove from Oklahoma City to Tulsa and sat with them. The investigator was successful in securing a letter from petitioner's ex-wife but not from his son.

In addition to researching and drafting the clemency brief, counsel also felt it necessary to refute several claims in the State's clemency packet; specifically, that petitioner had been violent or threatened a victim's family member. Researching those claims took additional time.

Finally, counsel described the approach taken during the hearing. Attorney Peterson stated that Attorney Nance

> approached the issues of mercy and clemency from a spiritual standpoint, which was both unusual and effective. He used PowerPoint slides to illustrate the main points of his argument. Videos of former correctional officers and the parents of a former death row inmate were shown to the Board. Several of the Board members had questions about the videos, about the history and legal issues of the case, and about the client's reasons for challenging his conviction during the 1990's.

## ANALYSIS

The Criminal Justice Act provides for appointed counsel in death penalty cases, including clemency proceedings. See Guide to Judiciary Policy, Vol. VII, Chap. 6.[6] Unlike other felony cases, the statutory maximum for compensation does not apply in death penalty proceedings. See 18 U.S.C. §§ 3006A(d), 3599(g). See also Guide to Judiciary Policy, Vol. VII, § 630. Because there is no statutory maximum, 18 U.S.C. § 3599 does not contain language allowing for excess compensation in cases where "excess payment is necessary to provide fair compensation." See 18 U.S.C. §§ 3006A(d)(3), 3599. However, both statutes contain language allowing for compensation for "adequate representation or investigative, expert, or other reasonably necessary services." 18 U.S.C. § 3599(a)(1). See also 18 U.S.C. § 3006A(a) (providing that "adequate representation" includes "counsel and investigative, expert, and other services necessary. . . ."). The guidelines also "encourage" courts to require counsel "to submit a proposed initial clemency budget for court approval that will be subject to modification in light of facts and developments

---

[6] The guidelines may be found at the following web address: http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/CJAGuidelinesForms/vol7PartA/vol7PartAChapter6.aspx (last visited on October 23, 2013).

that emerge as the case proceeds." Guide to Judiciary Policy, Vol. VII, § 680.30. In this case, the undersigned solicited two proposed budgets and conducted a hearing with counsel before setting the clemency budget at $12,000.00.

Although the District Court set a budget of $12,000.00, counsel now seeks $37,855.70 in payment. Of that total, the investigator seeks $2,146.49, Attorney Nance seeks $11,455.40, and Attorney Peterson seeks $24,253.81. These amounts include time spent on the case, travel expenses, and other expenses. To determine whether counsel is entitled to any compensation beyond that set in the budget, the undersigned turns first to the history and purpose of clemency proceedings.

**The History of Clemency and the Purpose of Clemency Proceedings**

As the United States Supreme Court has noted, "[c]lemency is deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." See Herrera v. Collins, 506 U.S. 390, 411-12, 113 S. Ct. 853, 122 L.Ed.2d 203 (1993). Clemency is defined as an act of "mercy or leniency." CLEMENCY, Black's Law Dictionary (9th ed. 2009). William Blackstone noted that "[l]aws (says an able writer) cannot be framed on principles of compassion to guilt: yet justice, by the constitution of England, is bound to be administered in mercy." 4 W. Blackstone, Commentaries *395.

"Historically, the institution of clemency seems to have had more to do with power than justice." Daniel T. Kobil, The Quality of Mercy Strained: Wresting the Pardoning Power from the King, 69 TEX.L.REV. 569, 583 (1990-91). In Greek civilization, clemency was rare, "largely because power rested with the people rather than with a monarch." Id. at 583. Clemency in ancient Greece required a petition with six thousand citizen signatures; therefore, clemency

resembled a popularity contest or, in the case of group pardons, political pragmatism, rather than an instrument to correct an injustice. See id. at 583-84. Likewise, the Romans used clemency as a political tool. See id. at 584-85.

In England, the pardoning power was not initially vested in the Crown. Rather, "the clergy, the great earls, and feudal courts" all claimed clemency power. Id. at 586 (citing Grupp, Some Historical Aspects of the Pardon in England, 7 AM. J. LEGAL. HIST. 51, 55 (1963)). In 1535, Henry VIII persuaded Parliament to pass an act establishing the Crown as the sole authority to grant pardons. See id. at 585. A subsequent political scandal in 1678, in which the King of England attempted to pardon the Lord High Treasurer of England while Parliament was trying to impeach him, led to the passage of a series of parliamentary acts that limited the Crown's clemency power. See id. at 586-88.

Clemency also played a role in the establishment of the American Colonies. See id. at 588-89. Felons were often granted a pardon in exchange for an agreement "to travel to the colonies and work on the plantations." Id. During the time that England governed the colonies, the King often delegated his power of clemency to the governors of the respective colonies. See id. at 589. Following the American Revolution, "most state governments placed the power to remit punishment for crimes in the legislative council and the governor jointly, or in the legislature alone." Id. at 590. The governor retained clemency power in only five states. See id.

The split among the colonies also fueled the debate about the federal pardoning power. Alexander Hamilton set forth the pros and cons of placing clemency power in the President. THE FEDERALIST No. 74 (Alexander Hamilton). Hamilton supported placing this power with the President and not with the legislature. See id. He stated that "[h]umanity and good policy conspire to dictate, that the benign prerogative of pardoning should be as little as possible

fettered or embarrassed." See id. Although Hamilton framed clemency power as a tool for justice, he also recognized that, in cases of treason, the power could be used to maintain order or political favor with the citizenry. See id. Ultimately, the drafters of the Constitution gave the President "Power to Grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." U.S. CONST., art. II, § 2. This exception for impeachment maintains the system of checks and balances, as the Constitution gives the Senate "the sole Power to try all Impeachments." U.S. CONST., art. I, § 3.

In the State of Oklahoma, the constitution initially vested the pardoning power exclusively in the Governor of the state. See Ex parte Ridley, 106 P. 549 (Okla. Crim. App. 1910). In 1910, the Oklahoma Supreme Court held that "any law which restricted this power would be unconstitutional and void," noting that the power conferred to the Governor by the constitution was "practically unrestricted, and the exercise of executive clemency is a matter of discretion." Id. at 551. From 1910 to 1944, governors "appointed various advisory boards and consulted with them at their will." Charles C. Chesnut, Pardons and Paroles in Oklahoma, 27 OBJ 1003 (1956).

In 1944, the state adopted a constitutional amendment that established the five-member Pardon and Parole Board. See id. See also Okla. Const. Art. 6, § 10. The Board has a duty "to make an impartial investigation and study of applicants for commutations, pardons or paroles, and by a majority vote make its recommendations to the Governor of all persons deemed worthy of clemency." Okla. Const. Art. 6, § 10. The bifurcation of clemency power in Oklahoma between the Governor and the Pardon and Parole Board is now well established, and "any attempt on the part of the Legislature to infringe upon [the] rights of the Governor or to delegate the same to a court or other body would be unconstitutional." Ex parte Smith, 137 P.2d 259, 261

(Okla. Crim. App. 1943). At the time of petitioner's hearing, the Pardon and Parole Board made non-binding recommendations to the Governor on every case before the Board for a final decision. In November 2012, after petitioner's execution in May 2012, Oklahoma adopted a change in its constitution that divides the clemency, or parole and pardon, authority between the Governor and the constitutionally created Pardon and Parole Board. Okla. Const., Art. 6, § 10 (amended by State Question No. 762, Legislative Referendum No. 360, adopted at election held November 6, 2012). The amendment gave the Board full authority to grant parole for nonviolent offenses after conviction by a majority vote, while removing the ability for the Board to make recommendations regarding the parole for persons sentenced to death or life imprisonment without parole. See id. However, the amendment did not change the fact that "[t]he Governor shall have the power to grant, after conviction and after favorable recommendation by a majority vote of the Pardon and Parole Board, commutations . . . except in cases of impeachment . . . ." Id.

Since the death penalty was reinstated in Oklahoma in 1976,[7] clemency has been granted in four cases. See http://www.deathpenaltyinfo.org/clemency (last visited on October 23, 2013). In 2001, Phillip Dewitt Smith was granted clemency because the Governor had doubts about his guilt. See id. In 2004, Osvaldo Torres' death sentence was commuted to life without parole because there were concerns about the trial's outcome. See id. (citation omitted). In 2008, Kevin Young was granted clemency "based on several factors, including the disproportionality of the punishment, questionable witnesses, and a decision during the original trial to turn down a plea

---

[7] In July 1976, the United States Supreme Court determined that the mandatory death penalty statutes in a number of states, including Oklahoma, were unconstitutional because they violated the Eighth and Fourteenth Amendments. See, e.g., Woodson v. North Carolina, 428 U.S. 280, 287, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 332, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); and Green v. Oklahoma, 428 U.S. 907, 96 S.Ct. 3216, 49 L.Ed.2d 1215 (1976). In response to these rulings, the Oklahoma legislature, on July 24, 1976, enacted a new first-degree murder statute that allowed the jury to impose the death penalty under certain circumstances. See OKLA. STAT. tit. 21, §§ 701.7 - 701.12.

bargain that would have resulted in a life sentence. See id. (citation omitted). Finally, in 2010, the Governor commuted Richard Tandy Smith's death sentence to life without parole because the Governor found a life sentence, not available at the time of Smith's sentencing, to be a more appropriate punishment. See id. (citations omitted). By comparison, between 1976 and 2011, Oklahoma executed ninety-six prisoners, although the statistics do not state whether all of those defendants participated in the clemency process. See http://www.deathpenaltyinfo.org/number-executions-state-and-region-1976 (last visited October 23, 2013).

The reasons for modern clemency are varied. Justice Holmes contended that

> [a] pardon in our day is not a private act of grace from an individual happening to possess power. It is part of the Constitutional scheme. When granted it is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed.

Biddle, 274 U.S. at 486. While judicial economy and expediency can play a role, most reasons for granting clemency are "equitable, practical, and 'humanitarian.'" James R. Acker and Charles S. Lanier, May God – or the Governor – Have Mercy: Executive Clemency and Executions in Modern Death-Penalty Systems, 36 Criminal Law Bulletin 200, 208 (2000). Doubts regarding a defendant's guilt or the reliability of the evidence used to convict are often cited. See id. Fairness is another consideration, particularly in cases where a co-defendant or co-defendants received a lesser sentence. See id. at 208-09. Mental status – whether it be mental illness, mental retardation, or age at the time of the offense – can also serve as a reason to grant clemency. See id. at 209.

External factors may also play a role. A defendant may be able to demonstrate, "through conduct evidencing significant remorse, rehabilitation, or redemption – that death no longer is an appropriate punishment." Id. Recommendations from third parties, "such as a victim's relatives, or a prosecutor, judge, or juror," may also be persuasive. Id. Finally, some governors with

clemency power have granted sweeping commutations, based upon a belief that the death penalty is morally wrong. Id. See also http://www.deathpenaltyinfo.org/clemency (citing five cases of such "broad grants of clemency" since 1976 and six other instances "prior to the reinstatement of the death penalty in 1976") (last visited on October 23, 2013).

In Oklahoma, the language of the constitution is broad enough to encompass all of these reasons, as the Pardon and Parole Board is mandated to make recommendations of clemency for those "deemed worthy." Okla. Const., art 6, § 10.

More importantly here, this historical review establishes that clemency is not a judicial proceeding and is not governed by statutes and rules designed to determine guilt or innocence. Rather, the power of clemency is generally placed in the executive or, in the case of Oklahoma (at the time), in the executive and an independent board, and the power may be wielded as the person or persons vested with the power see fit, guided only by principals of justice or individualized determinations of a defendant's "worth[iness]." Id. As the United States Supreme Court, in Herrara, noted, clemency is used ". . . where judicial process has been exhausted." 506 U.S. at 412 (emphasis added). Thus, traditional notions of "legal" representation should not automatically be applied to representation during a clemency proceeding.

More specifically, consistent with the historical use of clemency and the present day use in Oklahoma, a clemency proceeding, unlike litigation, is not intended to be lengthy. A petitioner presents a clemency packet to the Pardon and Parole Board (as does the State) on a date specified by the Chairperson of the Board. See Oklahoma Pardon and Parole Board Policy and Procedures Manual[8] at 44. The petitioner then appears for a two hour and twenty minute clemency hearing. See id. at 43-44.As noted by petitioner's counsel, there is no assurance that the Board will even

---

[8] The Policy and Procedures Manual is available at http://www.ok.gov/ppb/documents/Procedure %20Manual.pdf (last visited on October 24, 2013).

review the clemency packet. Thus, the value of preparing a lengthy clemency packet may be nominal, or of no use at all. The only sure thing is the hearing itself and the opportunity to make a personal plea to the Board during the hearing. Detailed and lengthy presentations regarding the law and the facts of the case are not likely to be successful. Thus, a lawyer's value in a clemency proceeding is primarily derived from his or her ability to help the defendant tell a compelling story that might evoke some compassion from the Board during the hearing. It is not in preparing legal briefs and in tracking down every potentially relevant fact.

In this case, petitioner's counsel appears to have left no stone unturned, and the undersigned is confident that they represented petitioner well at the hearing. However, the CJA does not provide for the payment of services designed to exhaust every possible or potential avenue of relief. Rather, it provides for payment of "adequate representation or investigative, expert, or other reasonably necessary services." 18 U.S.C. § 3599(a)(1). Implicit in the CJA is that counsel will use good judgment in determining the scope and extent of the legal services provided and that they will be paid only for those services that are reasonably necessary. Although the undersigned commends petitioner's counsel for the work performed, that work went well beyond what is compensable under the CJA.

## Compensation in Petitioner's Case

Initially, it is worth reiterating that petitioner's counsel was paid $9,247.91 for fees and expenses by the Tenth Circuit. This Court authorized another $12,000.00, noting at the time that most previously authorized clemency proceeding budgets were in the $10,000.00 range, total. So petitioner's counsel was authorized to incur more than double what this Court would generally expect to approve. Keeping this fact in mind, the undersigned's analysis follows.

Petitioner's attorneys focused on multiple strategies. Within the context of the purpose of the clemency process, each of those strategies had merit. Petitioner's clemency arguments fall into two categories – (1) personal and (2) legal – with a theme of fairness and mercy that runs throughout both categories. However, in reviewing the time spent to implement those strategies, the undersigned finds that much of the time spent was not necessary in light of the purpose and history of clemency proceedings.

<u>Personal Strategies</u>

Counsel focused on petitioner as a man whose life had value. Counsel presented letters from four family members – petitioner's younger sister, ex-wife, former stepson, and former sister-in-law. These letters are rather generic, as one might expect from family members who have limited contact with petitioner. Counsel's memorandum to the court explained that the investigator was responsible for soliciting these letters. The memorandum further explained that petitioner's ex-wife and biological son did not send letters when asked because both family members suffer from drug and alcohol addiction. Counsel argued that such letters are "an important part of a clemency packet"; therefore, the investigator spent 11.0 hours to travel from Oklahoma City to Tulsa "to meet them in person and get the letters." The investigator was successful in obtaining a letter from the ex-wife, but "[s]adly, the son could not hold still long enough to write a letter."

The packet also contained a letter from an attorney who formerly served as counsel for petitioner, and letters from two attorneys who represented another inmate, Garry Allen, on death row. These letters are much more compelling. Petitioner's former counsel describes petitioner's demeanor and his behavior in prison. The letter describes a man who was given positions of responsibility within the prison system and who spent his time volunteering for in-prison

programs designed to help others. Similarly, the letters from Mr. Allen's attorney describe a man of great compassion. Petitioner often assisted Mr. Allen, who suffered from a seizure disorder, with his personal care to the point of bathing Mr. Allen and cleaning up after him. Petitioner also agreed to testify to his observations during a hearing on Mr. Allen's competency. The time spent to obtain these letters is not reflected in the time sheets, either for the investigator or for counsel; therefore, it appears that minimal time was required to obtain them.

Counsel obtained statements from correctional officers who had contact with petitioner during his time under their supervision. During petitioner's second trial in 1998, petitioner's attorney solicited testimony from four current and former correctional officers regarding petitioner's good behavior and participation in volunteer programs. Attorney Nance's time sheets indicate that he spent 12.8 hours reviewing the court record. The time spent finding and reviewing that testimony would be included in those time entries.

For the clemency hearing, counsel also obtained videotaped statements from former correctional officers to present to the Pardon and Parole Board. The former officers testified to petitioner's positive contributions to the prison environment and his ability to be "a stabilizing influence in the prison population." Finally, the investigator obtained videotaped statements of former death row inmates and the parents of a former death row inmate for inclusion in the presentation to the Pardon and Parole Board. Counsel's memorandum states that all of these videotaped interviews ask for clemency. The investigator performed all of this work. The time spent conducting the videotaped interviews is not included in the time sheets submitted (and the memorandum from counsel notes that the investigator was paid for that work through the Tenth Circuit Court in 2011), but the investigator reported spending 11.0 hours editing the video and an additional 1.5 hours copying the video for the clemency hearing.

Legal Strategies

Counsel raised two strategies with underlying legal principles, both based on the unusual procedural history of petitioner's case. First, counsel argued that petitioner was being subjected to both a life sentence and a death sentence. At the time of the clemency hearing, petitioner had served more than thirty-six years in prison, much of that under a life sentence. Counsel argued that this time represented "the lion's share" of a life sentence and that to execute petitioner would be "both excessive and unfair."

As part of this argument, counsel spent 8.5 hours compiling a list of thirty-eight other defendants convicted of murder who were sentenced to death between 1973 and 1976. None of those defendants was facing execution, and four were on parole. Counsel argued that because the State had relied on Riggs and asked for a life sentence in 1977, the State should not have been permitted to seek to overturn Riggs and pursue a death sentence twenty years later.[9] Petitioner's former counsel, in his letter to the Pardon and Parole Board, also noted the unusual procedural history of the case, and stated that his research had failed to uncover another case like it.

Next, counsel argued that petitioner had received the death penalty only because he pursued his constitutional right to appeal. Counsel contends that when petitioner sought to challenge the representation he received at his first trial, he did so under the belief that he was already serving the harshest sentence available – life imprisonment. Challenging the representation he received – a challenge that ultimately proved successful – seemed to pose no risk. The State raised the issue of the death penalty by challenging Riggs only after petitioner was successful in his appeal. Counsel argued that petitioner should have been able to rely on Riggs or given an opportunity to withdraw his challenge to his conviction. Because petitioner

---

[9] The Court notes that petitioner's counsel made this argument repeatedly during the re-trial and during the appeals process. Each time, it was rejected.

had not been given those opportunities, clemency was the only way to "ensure that [petitioner] is not punished for an unexpected change in the law."

In addition to the time set forth, *supra*, the time records state that Attorney Peterson spent 43.4 hours researching and drafting the clemency brief and 3.5 hours researching facts specific to petitioner, including petitioner's history before the Pardon and Parole Board. He spent an additional 6.5 hours preparing for the clemency hearing. Attorney Nance spent 7.1 hours on research and writing and an additional 15.2 hours preparing for the hearing, where he served as the primary presenter. This time does not include time spent reviewing the interview notes and video interviews (6.1 hours), corresponding with Attorney Peterson (7.4 hours), and reviewing drafts and other documents (6.0 hours).

<u>Time Records</u>

In reviewing the time records, the undersigned has separated those administrative tasks from the substantive tasks and has discounted the time spent on administrative tasks. As to the administrative tasks, Attorney Peterson's records reflect that he spent 14.5 hours addressing the budget issues and an additional 1.9 hours researching and drafting a brief seeking to have Attorney Nance appointed. The applicable statute and CJA guidelines provide for payment for legal representation and reasonably necessary services associated with that representation. <u>See</u> 18 U.S.C. § 3599; Guide to Judiciary Policy, Vol. VII, Chap. 6. The undersigned finds that these records reflect time spent performing administrative tasks rather than the legal representation of petitioner. Under these circumstances, and in light of the budgetary restrictions, the undersigned recommends that this time not be reimbursed. Thus, $2,919.20 (16.4 hours x $178.00) should be deducted from Attorney Peterson's CJA request. The undersigned also recommends deducting

$53.40 for the 0.3 hours spent in telephone conferences with the magistrate judge and designated as "court time" in the time records.

As to the substantive tasks, the undersigned finds that the time spent producing the edited video was not reasonably necessary. Attorney Peterson's memorandum states that the raw footage was presented to the Pardon and Parole Board as part of the clemency packet. Counsel made the additional decision to present an edited video that played the "highlights of the former officer and the parent statements at the hearing." The investigator spent 11.0 hours editing the video. The Pardon and Parole Board could have reviewed these interviews in their entirety in preparation for the hearing or after the hearing, if they felt doing so would be helpful in light of petitioner's presentation. Certainly, counsel could have quoted the interviews in his presentation and urged the Pardon and Parole Board to review the videos. Compiling highlights in video format was an extra step that was unnecessary in light of the budget constraints. Accordingly, the undersigned recommends deducting $990.00 (11.0 hours x $90.00) from the investigator's CJA request.

Additionally, the investigator spent 11.0 hours traveling to Tulsa to try to obtain letters of support from petitioner's ex-wife and son. Ultimately, the investigator was only able to obtain one letter, from petitioner's ex-wife. The undersigned understands the importance of support letters in clemency proceedings, but counsel had already procured a number of other letters from family members and from attorneys who had represented petitioner or interacted with him in the representation of other death row inmates. In addition, the time sheets do not indicate whether the investigator spent time soliciting letters from petitioner's ex-wife and son by telephone or whether other methods were used; therefore, the undersigned lacks sufficient information to determine the necessity of the trip to Tulsa. More importantly, the value of the letter from

petitioner's ex-wife and the potential value of any letter from his son, in light of their relationships with petitioner and their situation at the time, had to be questionable at best. Accordingly, the undersigned recommends reducing this time by 80%, resulting in a deduction of $792.00 (8.8 hours x $90.00).

Because the investigator's time was split between two tasks that appear largely unnecessary, the undersigned would also recommend reducing the time spent on correspondence between the investigator and Attorney Peterson. Attorney Peterson spent 11.7 hours emailing, telephoning, and meeting with the investigator. The undersigned recommends reducing this time by 80%, or $1,655.40 (9.3 hours x $178.00).

Because the investigator served at the direction of Attorney Peterson, the undersigned recommends further reducing Attorney Peterson's reimbursement by $1,485.00 and awarding that amount to Investigator Christopher.

In reviewing the substance of these strategies and comparing them to the time records, the undersigned finds that some of the time spent was not reasonably necessary. The clemency brief is straightforward. Counsel's strategies do not rely on complex legal arguments or detailed factual analysis, nor do they raise any new arguments. Instead, consistent with the concepts of mercy and leniency, counsel focused on broader concepts of fairness and justice. Attorney Peterson recorded 43.4 hours of time researching and drafting the clemency brief and 6.5 hours preparing for the hearing. Attorney Nance spent 7.1 hours researching and drafting the clemency brief, 12.1 hours reviewing the interview notes and video, 12.8 hours reviewing court records, and 15.2 hours preparing for the hearing. Additionally, Attorney Peterson recorded 5.6 hours of correspondence time with Attorney Nance and with members of the Federal Public Defender's Office Capital Habeas Unit in the Western District of Oklahoma, while Attorney Nance's records

reflect 7.4 hours in telephone conferences and email correspondence. In light of the substance and nature of the arguments presented, the undersigned recommends deducting 70% of that time from the CJA vouchers. This cut results in a deduction of $6,915.30 (55.5 hours x .70 x $178.00) for Attorney Peterson and $6,803.16 (54.6 hours x .70 x $178.00) for Attorney Nance.

Finally, the undersigned finds that the time spent compiling the list of former death row inmates could have been performed by the investigator or a paralegal rather than by Attorney Peterson. Accordingly, the undersigned recommends reducing Attorney Peterson's time for this task in the same proportion that the investigator's hourly rate is to his, resulting in a reduction of 4.2 hours, or $747.60 from Attorney Peterson's CJA voucher.

## CONCLUSION

For the reasons set forth above, the undersigned recommends that the District Court approve the CJA vouchers as follows:

**Attorney Peterson** originally requested $23,638.40 in fees, $391.00 in travel expenses, and $224.41 in other expenses. The undersigned recommends that Attorney Peterson's request be approved as follows:

|   |   |   |
|---|---|---|
|   | $23,638.40 |   |
| - | $ 2,919.20 | (elimination of fees associated with administrative tasks) |
| - | $     53.40 | (budget conference with the undersigned) |
| - | $ 6,915.30 | (70% reduction in research, drafting, correspondence, and preparation for hearing) |
| - | $ 1,655.40 | (80% reduction in correspondence time with the investigator) |
| - | $ 1,485.00 | (award of fees to Investigator Christopher) |
| - | $    747.60 | (application of investigator's rate for compilation of inmate list) |
|   | **$ 9,862.50** | **Reduced Fee Award** |
|   | **$    391.00** | **Travel expenses** |
|   | **$    224.41** | **Other expenses** |
|   | **$ 10,477.91** | **Total approved** |

**Attorney Nance** originally requested $11,422.40 in fees and $33.00 in other expenses. The undersigned recommends that Attorney Nance's request be approved as follows:

| | | |
|---|---|---|
| | $ 11,422.40 | |
| - | $   6,803.16 | (70% reduction in research, drafting, correspondence, and preparation for hearing) |

| | |
|---|---|
| **$  4,619.24** | **Reduced Fee Award** |
| **$       33.00** | **Expenses** |
| **$  4,652.24** | **Total approved** |

**Investigator Christopher** requested $1,935.00 in compensation, $136.52 in travel expenses, and $74.97 in other expenses. The undersigned recommends that Investigator Christopher's request be approved as follows:

| | | |
|---|---|---|
| | $  1,935.00 | |
| - | $     990.00 | (100% reduction in editing time on video) |
| - | $     792.00 | (80% reduction for traveling and meeting family members for letters) |
| | $     153.00 | |
| + | $  1,485.00 | from Attorney Peterson's fee award (see *supra*) |

| | |
|---|---|
| **$  1,638.00** | **Reduced Fee Award** |
| **$     136.52** | **Travel expenses** |
| **$       74.97** | **Other expenses** |
| **$  1,849.49** | **Total approved** |

These deductions reduce the overall payment for the clemency proceedings from $37,855.70 to $16,979.64. This amount exceeds the original $12,000.00 budget and does not include the $9,247.91 already received from the Tenth Circuit. Thus, the total awarded amount (Circuit and District Court) exceeds the more typical $10,000.00 award by $16,227.55. Further, the recommended amount fairly compensates counsel for the work that was and should have been performed by counsel and the investigator.

**OBJECTION**

The District Judge assigned to this case will conduct a *de novo* review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned. As part of her review, the Judge will consider the parties' written objections to this Report and Recommendation. A party wishing to file objections to this Report and Recommendation must do so by December 6, 2013. See 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). The failure to file written objections to this Report and Recommendation may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court. See Moore v. United States, 950 F.2d 656 (10th Cir. 1991); and Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).

SUBMITTED this 22nd day of November, 2013.

T. Lane Wilson
United States Magistrate Judge